WILKINSON, Circuit Judge,
concurring in part and dissenting in part:
I respectfully dissent from the reversal of the judgment. I agree that we possess jurisdiction to entertain al-Marri’s habeas petition. I also believe the district court to be right in all respects and that its judgment dismissing the petition should be affirmed.
I wish to express my respect for those who see this matter differently. ' I admire the skill with which my fine colleagues and the principal and amicus briefs have argued the case for reversal, and I respect the sense of conviction and principle that animates their views. I realize too that the opinions in this case are lengthy, but that reflects nothing more than the conscientious attention each member of the court has given this important case.
I quite disagree with the reversal of the judgment. I believe that Congress in the AUMF has authorized the military detention of al-Marri and that al-Marri has received the process he is due.
I recognize that the military detention of someone lawfully in this country is a momentous step, but a refusal to recognize Congress’s ability to authorize such a detention in these circumstances would be more momentous still. The present case reminds that we live in an age where thousands of human beings can be slaughtered by a single action and where large swaths of urban landscape can be leveled in an instant. If the past was a time of danger for this country, it remains no more than prologue for the threats the future holds. For courts to resist this political attempt to meet these rising dangers risks making the judiciary the most dangerous branch.
I say this not as an exhortation to panic or fear, but rather as a call for prudence. The advance and democratization of technology proceeds apace, and our legal system must show some recognition of these changing circumstances. In other words, law must reflect the actual nature of modern warfare. By placing so much emphasis on quaint and outmoded notions of enemy states and demarcated foreign battlefields, the plurality (the opinion authored by Judge Motz) and concurrence (the opinion authored by Judge Traxler) misperceive the nature of our present danger, and, in doing so, miss the opportunity presented by al-Marri’s case to develop a framework for dealing with new dangers in our future. There is a way to respect both our commitment to liberty and the need for security without which liberty cannot flourish. But it is not the way my fine colleagues have chosen, and I must respectfully dissent from the reversal of the judgment.[1]
*294 The essence of the plurality’s view is that law deprives this country of those means of adjustment that the political branches deem essential to success in the struggle against those who launched and prepare again to launch attacks against America. I am happy indeed that the plurality did not prevail in its view that the AUMF fails to authorize the military detention at issue in this case. That the judiciary should embrace a sense of rigidity and complacency not elsewhere reflected in our democratic process seems both an expansion of judicial warrant and a course of error that may lead to tragic results and lasting regrets.
By ignoring the AUMF’s plain language and patent meaning, the plurality comes all too close to holding that no person lawfully in the United States may be seized as an enemy combatant and subjected to military detention, and certainly not subjected to detention of any appreciable length. That to me is the plain import of the plurality’s view, and its interpretation of the AUMF not only undermines Congress’s intent but also suggests that the “serious constitutional questions” underlying the case compel a ruling in al-Marri’s favor. Ante at 226.
Similarly, the concurrence, by forsaking the burden-shifting scheme established in Hamdi and imposing more rigorous procedural protections at the very outset of enemy combatant proceedings, implies that something more akin to a criminal trial is in order. In so doing, the concurrence accomplishes through constitutional interpretation much of what the plurality attempts to accomplish through statutory construction: an erosion of the elected branches’ ability to pursue the current conflict in accordance with the laws of war.
The plurality and the concurrence thus both overlook the fact that our Constitution is a feat of architecture as well as a charter of cherished rights. To overlook the constitutional allocation of authority to Congress and the President in this case is to replace the Framers’ design with our own precarious arrangements.
Moreover, with their judgment, the plurality and the concurrence abandon any recognized understanding of procedural due process and leave this case totally up in the air. The touchstone of procedural due process has always been accuracy. The plurality and concurrence, however, now mandate the imposition of some uncertain quantum of procedures despite the fact that al-Marri, although represented by counsel and given every opportunity by the trial court to do so, did not cast the slightest doubt on any of the government’s extensive declarations. Additional procedures may of course be required when the *295 accuracy of the government’s evidence is called into question, and the burden on al-Marri in this regard is not high. Imposing additional process at the outset, however, — completely untethered from any need to ensure accuracy — will lead to more graymail, more fishing expeditions, and more thrashing litigiousness, all without any corresponding benefit in terms of reliable determinations or practical effect. Moreover, this novel procedural approach provides the district court with precious little direction on remand. I simply have no idea what constitutes “the most reliable available evidence,” ante at 218, nor do I know what procedures should be used to determine whether the government’s evidence meets this standard. The district court will be similarly mystified.
The problem presented here is greater than al-Marri’s case and even than 9/11. The sources of this nation’s vulnerability— its long borders, its multiple ports of entry, its densely-packed cities, the dispersions of lethal materials, the march of advancing technologies, and the widening distribution of knowledge as to the means and implements of mass destruction — long predated September 11th and will long continue even as the events of that day recede in memory.
Some of the scenarios are discounted as farfetched, until suddenly they are not. Nuclear devices capable of inflicting enormous casualties can now fit inside a suitcase or a van. Congress can and has made clear that the use of such a device by persons or groups associated with the 9/11 attacks would be more akin to an act of war than to ordinary crime. Regrettably, however, the plurality and, to a somewhat lesser extent, the concurrence regard these acts quite differently — as mere criminal offenses to be tried through the criminal justice process or something that will become increasingly its equivalent. This reluctance to allow Congress to distinguish between war and crime will hinder the elected branches in their effort to tame the true tragedy of modern times: the indiscriminate slaughter of innocent life.
The events of 9/11 have afforded us an opportunity to address these non-chimerical concerns and to build a framework for this most dangerous future. Congress in the AUMF and the Supreme Court in Hamdi provided us with building blocks for a set of post-9/11 legal principles. By forsaking the evident intent of the AUMF, and departing from the Hamdi framework, however, the plurality and concurrence have missed this opportunity. It is for this reason too that I dissent in this case.
This need for some legal framework is not just an opportunity. It is our obligation. The military detention of American citizens or aliens lawfully within this country is a huge step. It is a mistake to take this step without asking where the journey leads. A failure to locate enemy combatant detentions within a general or principled framework will serve only to heighten concerns that open-ended detentions of American citizens lie in the offing. A principled framework, by contrast, addresses the limits of executive authority. While a minimalist method has much to commend it in many circumstances, it has its drawbacks here. This is not an area where ad hoc adjudication provides either guidance or limits, and it leaves the most basic values of our legal system — liberty and security — in limbo.
I thus have some points of difference with each of my good colleagues. I do not agree with the plurality, as I believe the AUMF does authorize al-Marri’s detention. I do not agree with the concurrence or Judge Gregory, as I believe that al-Marri received the process he was due. I do not agree with the Chief Judge or *296 Judge Niemeyer that we can resolve a question of this order of magnitude— namely the military detention of American citizens or lawful aliens in this country— without addressing the serious constitutional issues that attend such a move. If I could approach this whole question in such a fashion, I would surely do so. But the Supreme Court’s recent decision in Boumediene v. Bush, — U.S. -, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), demonstrates that even coordinated action by the democratic branches is subject to constitutional limits. Indeed, the scope of the executive’s detention authority turns not only on “whether the AUMF authorizes,” but also on whether “the Constitution permits,” military detention to take place. Id. at 2271-72.
The danger of ignoring this constitutional inquiry is that we would proceed through increments and accretions to a system that features contradictory court rulings on military detentions throughout our land, gives no notice to Congress or the executive as to what the permissible boundaries of enemy combatant detentions might be, and, at worst, ends up inflicting grave damage to the constitutional fabric at the end that none of us intended at the start. Far better, it seems to me, to at least start this journey with a map, lest this case of first impression become an aimless voyage.
The plurality derides this attempt to delineate a constitutional framework as a policy-based exercise in “invention].” Ante at 218; see also ante at 226-27 n. 9, 241^42. But the policymaking in this case comes from those who would aggressively interfere with democratic prerogatives in the context of armed struggles, not from those who would interpret our foundational document with a proper respect for separation of powers and a proper demonstration of judicial restraint. The policymak-ing in this case comes from those who would so torture the text of the AUMF as to render it inapplicable even to al Qaeda members situated identically to those who perpetrated the 9/11 attacks. I certainly do not hold the position reflected in the judgment that courts should counteract Congress’s plain intention or construct some set of unspecified procedures according to judicial designs. At the same time, the judiciary plays a vital role in ensuring that enemy combatant detentions are consistent with the constitutionally prescribed war powers and not a subterfuge for circumventing our cherished Bill of Rights. I make no apologies for regarding the restraint of the third branch as the starting point for all my inquiries in matters pertaining to the conduct of war. I make no apologies either for recognizing that there are constitutional limits on the military detention power and for trying to determine what they are.
I shall thus attempt to provide some framework as to why al-Marri’s detention is lawful and why, at the same time, the military detention authority is anything but open-ended. My own opinion proceeds as follows. In Section I, I discuss why the AUMF applies on its own terms to justify al-Marri’s detention. In Section II, I address the basic premise of al-Marri’s argument — that formal criminal charges are required in order for the government to detain him. In Section III, I address the serious constitutional questions that arise from, as well as the limits that apply to, the military detention of a citizen or lawful alien apprehended on American soil. In Section IV, I address my concurring colleague’s argument that the procedures afforded al-Marri were constitutionally deficient. Finally, in Section V, I discuss, in a larger sense, why the dismissal of al-Mar-ri’s petition can be squared with America’s cherished legal heritage.
*297 To reverse this judgment because al-Marri was not captured on a foreign battlefield or foreign soil is akin to a judicial declaration that Congress and the executive may fight only the last war. This is wrong. Access to the courts is important, and I would certainly provide it here. But litigation is not the only friend of liberty. Democracy is a guarantor of human life and freedom, too.
I thus have no doubt that this detention is lawful. This detention has been authorized by Congress. This detention is, and remains, subject to judicial oversight. This detention is a direct outgrowth and response to massive attacks on the U.S. homeland. This detention is consistent with Supreme Court precedent. This detention is in accordance with the laws of war. And this detention should be sustained.
I. THE AUMF AUTHORIZES THE DETENTION OF AL-MARRI.
On September 18, 2001, one week after the most devastating attack on the U.S. homeland in its history, Congress passed the Authorization for Use of Military Force (“AUMF”). The plurality recognizes — as it must — that the AUMF authorizes the President to order the military detention of enemy combatants. See ante at 228-29 (Motz, J., concurring in the judgment). The plurality also notes that the primary issue before us in this case is whether the petitioner, Ali Saleh Kahlah al-Marri, is an enemy combatant within the meaning of the AUMF. See ante at 221-22.
Despite spending much of its opinion interpreting the AUMF, however, the plurality barely discusses the AUMF’s purpose, so plainly reflected in its text: to hold those responsible for the September 11th attacks accountable, and to prevent similar acts of terrorism from ever happening again. This omission is telling. By failing to appreciate the entire reason for the AUMF, the plurality is able to produce an incredible result: it interprets the AUMF so that even the 9/11 attackers themselves would not be considered enemy combatants under it.
The plurality’s conclusion is a paradox without parallel. A resolution designed to address a problem is read to leave the problem unaddressed. The reach of a resolution responding to hijacked domestic flights aimed at domestic targets and designed to inflict massive domestic casualties is confined to a foreign battlefield. In holding that the 9/11 hijackers would not be enemy combatants within the meaning of the foremost congressional response to 9/11, the plurality denies the legislative branch the ability to mean what it says. It deprives not only this congressional action of effect, but, in essence, grants the judiciary an expanding veto over future congressional efforts to protect this country.
To appreciate fully the error of the plurality’s ways, one need consider nothing more than the AUMF itself, which, in the more than six years since its passage, has never been amended, much less rescinded:
[T]he President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.
AUMF, Pub.L. No. 107-40, 115 Stat. 224 (2001).
The AUMF grants the President broad power: the power to use “all necessary and appropriate force” to prevent “any" *298 future acts of terrorism by those who perpetrated the September 11th attacks and their affiliates. The President’s power is not limited temporally: he may use force against those who “planned” 9/11 as well as those who prepare “future” acts of terrorism. Nor is the President’s power limited geographically: the preamble of the AUMF specifically directs the President “to protect United States citizens both at home and abroad.” Id. (emphasis added). Finally, recognizing the new security risks presented by global terrorist organizations, such as al Qaeda, and global terrorists, such as Osama bin Laden, the AUMF authorizes the President to use force against not only the “nations,” but also the “organizations” and “persons,” that were responsible for the September 11th attacks.
Al-Marri does not so much as dispute the allegations against him, which we are obliged therefore to credit for purposes of this case. See ante at 217, 221. According to the Rapp Declaration, in which the government details the evidence supporting the detention of al-Marri as an enemy combatant, al-Marri was closely associated with al Qaeda, the terrorist organization that perpetrated the September 11th attacks. Al-Marri attended an al Qaeda terrorist training camp in Afghanistan for fifteen to nineteen months, and subsequently cultivated relationships with the most senior members of the al Qaeda organization: he met personally with Osama bin Laden and volunteered to martyr himself for the al Qaeda cause; he entered the United States as a sleeper agent under the direction of Khalid Shaykh Muhammed, the mastermind of the 9/11 attacks; and he received substantial funding for his mission from Mustafa Ahmed al-Hawsawi, the financial facilitator of 9/11. Id. at 220.
And that is not all. Al-Marri was actively planning terrorist attacks at the time of his arrest in the United States. Before he was apprehended, al-Marri had been gathering technical information about poisonous chemicals on his laptop, and was in communication with both Muhammed and al-Hawsawi. Id. Moreover, he had undertaken efforts to obtain false identification, credit cards, and banking information, including stolen credit card numbers. Id.
It should be clear that al-Marri is the paradigm of an enemy combatant under any reasonable interpretation of the AUMF. When Congress directed the President to “use all necessary” force — including the power of military detention — “to prevent any future” attacks by those “organizations” responsible for 9/11, it must certainly have targeted al Qaeda “sleeper agents” planning similar attacks in the United States. To say that Congress did not have persons such as al-Marri in mind is to say that Congress had very little in mind at all.
In what I suppose is intended as a criticism, the plurality says I would give full effect to the “broad language” of the AUMF. Ante at 244-45. But of course. Judges take and treat with respect what Congress gives them. I do not pretend that there are not hard cases under the AUMF: for example, if the President were to detain an alleged terrorist with more tenuous links to al Qaeda or more ambiguous intentions than al-Marri has. There are indeed difficult questions as to the reach of the authority Congress has conferred upon the President. But the possibility of hard cases does not hide the fact that this case fits squarely within the bounds of the AUMF. Al-Marri was indisputably a member of al Qaeda, and he was indisputably planning terrorist attacks to kill American citizens and destroy American property. If al-Marri is not an “ene *299 my combatant” under the AUMF, then who is?
The plurality’s view also rests on four faulty premises. First, the plurality erroneously asserts that al-Marri cannot be considered an enemy combatant because the government has “never alleged that he is a member of any nation’s military [or] has fought alongside any nation’s armed forces.” Ante at 217 (emphasis added). The plurality bases this “nation” affiliation requirement on a misguided reading of the Supreme Court’s opinion in Hamdi v. Rumsfeld, 542 U.S. 507, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (plurality op.), and our circuit’s opinion in Padilla v. Hanft, 423 F.3d 386 (4th Cir.2005), which relied heavily on Hamdi. According to the plurality, a relationship with the Taliban, “the de facto government of Afghanistan at the time,” ante at 228, was critical to each court’s ultimate holding that the petitioner could be classified as an enemy combatant. Thus, the plurality contends, absent such an affiliation with an enemy nation, an individual cannot qualify as an enemy combatant. Ante at 229-30, 231 (asserting that enemy combatant status rests on an individual’s “affiliation with the military arm of an enemy nation”).
The plurality’s “nation” affiliation requirement finds no basis in the text of the AUMF, misreads the opinions in Hamdi and Padilla, and fails to recognize the backdrop against which the AUMF was passed. As noted earlier, the AUMF states quite explicitly that “the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons ” responsible for the September 11 attacks. AUMF, 115 Stat. 224 (emphasis added). Thus, the plurality’s notion that enemy combatants under the AUMF must be affiliated with a “nation” at war with the United States flatly contradicts the AUMF’s text.
Furthermore, the plurality erroneously limits the scope of the holdings in Hamdi and therefore Padilla. According to the plurality, under these two cases, “affiliation with the military arm of an enemy nation ” is a necessary condition for being labeled an enemy combatant under the AUMF. Ante at 230 (emphasis added).
Of course, the petitioners in both Hamdi and Padilla were at one time affiliated with Taliban units in Afghanistan. See ante at 228, 229. However, neither the Hamdi Court nor the Padilla court made this fact the lynchpin of its decision. For instance, in Hamdi, the Supreme Court made very clear that its decision only answered “the narrow question” of whether the detainee, based on the facts alleged, could be classified as an enemy combatant. Hamdi, 542 U.S. at 516, 124 S.Ct. 2633. The Court never indicated that those facts circumscribed the outer bounds of the enemy combatant category. Id. at 517, 124 S.Ct. 2633.
In fact, Hamdi specifically noted that the “permissible bounds of the [enemy combatant] category will be defined by the lower courts as subsequent cases are presented to them.” Id. at 522 n. 1, 124 S.Ct. 2633. If the facts alleged in Hamdi were, as the plurality suggests, binding requirements for enemy combatant status, then the Court’s observation and directive to lower courts would have been unnecessary. Thus, any claim that Hamdi sets forth the exclusive requirements of the enemy combatant category has a problem: it cannot be reconciled with the Court’s own statements.
Finally, the plurality’s “nation” affiliation requirement ignores the context in which Congress passed the AUMF. When interpreting legislation that authorizes the use of force against both “nations” and “organizations,” I struggle to find any meaningful distinction between affiliating *300 with a so-called “de facto government,” like the Taliban, and affiliating with a terrorist organization like al Qaeda.' This is particularly true given the fact that, in many ways, it is impossible to distinguish al Qaeda from a “de facto government”:
[It] has a standing army; it has a treasury and a consistent source of revenue; it has a permanent civil service; it has an intelligence collection and analysis cadre; it even runs a rudimentary welfare program for its fighters, and their relatives and associates. It has a recognizable hierarchy of officials; it makes alliances with other states; it promulgates laws, which it enforces ruthlessly; it declares wars.
Philip Bobbit, The Shield of Achilles 820 (2002).
The second faulty premise of the plurality is the erroneous claim that al-Marri does not qualify as an enemy combatant because he was not allegedly “seized on, near, or having escaped from a battlefield on which the armed forces of the United States or its allies were engaged in combat.” Ante at 220 (emphasis added). This purported “battlefield” requirement is also based on the plurality’s mistaken interpretation of Hamdi and Padilla. See ante at 228 (noting that Hamdi was captured on a battlefield); id. at 229-30 (noting that Padilla had been on a battlefield).
Although I will discuss the relevance of the battlefield in more detail later, it suffices for now to say that the plurality’s “battlefield” requirement also does not comport with the text of the AUMF, relevant case law, or the context in which the AUMF was enacted. It is every bit as much a gloss on the AUMF as the “nation” affiliation requirement is — and every bit as misplaced.
To begin, the text of the AUMF is in no way restricted to those persons who have fought or seen action on a foreign battlefield. As mentioned earlier, the AUMF contains no such location limitation and specifically states that its animating purpose is to “protect United States citizens both at home and abroad.” AUMF, 115 Stat. 224. While the plurality attempts to support its conclusion that the AUMF was not meant to operate “right here in the United States” with statements made by members of Congress more than four years after the passage of the AUMF, see ante at 239, I would hope the judicial branch would respectfully bypass post-hoc commentary by distinguished members of the legislative branch intended either to expand or restrict or otherwise reinterpret what Congress plainly expressed and just as plainly stands by.
Next, although Hamdi and Padilla had seen action on a battlefield, such a factor represents a potentially sufficient condition, not a necessary one, for qualifying as an enemy combatant under those cases. An absolute requirement that someone must have been on a battlefield in order to receive enemy combatant status would run headlong into Ex parte Quirin, 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3 (1942). In that case, the Nazi saboteurs were not captured on or near a battlefield, but rather in the United States, after surreptitiously entering “from enemy territory into our own.” Id. at 35, 63 S.Ct. 2. The Court held that even though they had not “entered the theatre or zone of active military operations,” i.e. the battlefield, the saboteurs were properly detained as enemy combatants. Id. at 38, 63 S.Ct. 2.
Finally, the notion that enemy combatants can only be found on the battlefield is completely antithetical to Congress’s purpose for passing the AUMF. The September 11th hijackers targeted civilians on American soil, not a foreign battlefield. The thousands slaughtered in the Twin Towers, the Pentagon, and aboard United *301 Flight 93 were not on any battlefield. To condition the enemy combatant category on battlefield participation is simply wrong.
Third, the plurality appears to be influenced by the fact that the length of the current struggle “has no bounds” and thus the current detention may be an “indefinite” one. See ante at 252. I do appreciate the plurality’s concern in this regard. No formal armistice with al Qaeda or its offshoots is in the offing, and while 9/11 marked the beginning of widespread awareness that we were at war, no similarly defining event is likely to mark the end. But as much as I respect the plurality’s concern on this point, I cannot ultimately accept it, because it is tantamount to an assertion that Congress should have repealed the AUMF or limited its duration, which Congress has not done.
There is in fact nothing in the text of the AUMF that limits the duration of its operational force — it applies both retrospectively to bring those responsible for 9/11 to justice and prospectively to prevent future attacks. And as noted, Congress has not repealed the AUMF or modified its language in any way. I am not prepared to second guess its judgment. There is evidence that al Qaeda, which has announced an intent to launch further attacks upon America, is not a degraded force but a reconstituted one, operating, among other places, in the Waziristan regions of northwest Pakistan. See, e.g., Scott Shane, Same People, Same Threat, N.Y. Times, July 18, 2007, at Al. Whatever the case may be, it is surely within the ambit of constitutional judgment for Congress to conclude that the AUMF should continue in effect and that an ongoing threat must be met with an ongoing resolution.
Until the AUMF undergoes some change from the body that enacted it, the courts must honor its express intent. To approach this war on terror otherwise would allow separation of powers in this long-protracted struggle to fall victim to a short judicial attention span.
The plurality’s fourth faulty assumption is that Ex parte Milligan, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866), precludes a determination that al-Marri is an enemy combatant under the AUMF. The plurality contends that Milligan’s conduct “mirror[s] the Government’s allegations against al-Marri.” Ante at 237. But this overlooks the basic difference between the two cases: Congress never authorized the use of military force against the Sons of Liberty, Milligan’s organization, see Milligan, 71 U.S. at 6, but Congress has authorized the use of force against al Qaeda, al-Marri’s organization, see AUMF, 115 Stat. 224. Milligan’s constitutional force is felt only after it has been determined the individual may not be classified as an enemy combatant. See Quirin, 317 U.S. at 45, 63 S.Ct. 2. Because al-Marri plainly qualifies as an enemy combatant under the AUMF, the principles of Milligan do not preclude detention here.
Similarly, al-Marri argues that the Patriot Act’s detention provisions supersede, and therefore abrogate, the President’s authority under the AUMF to detain enemy combatants. See Brief of Appellants at 14-15. The plurality wisely rejects this contention, recognizing that “the Patriot Act does not eliminate the statutory authority provided the President in the AUMF to detain individuals who fit within the legal category of enemy combatant.” Ante at 241 (internal quotation marks omitted).
Al-Marri’s argument properly fails because the AUMF and Patriot Act have different spheres of operation. While the AUMF represents a specific response to the 9/11 attacks, authorizing military force against those responsible for the attacks, *302 the Patriot Act has a different point of emphasis: providing law enforcement with additional tools and tactics — such as an increased ability to access records, regulate financial transactions, and perform surveillance — designed to prevent terrorism generally, regardless of whether the suspect was associated with 9/11. See Pub.L. No. 107-56, 115 Stat. 272 (2001). Thus, to the extent that there is even a hint of potential conflict, the AUMF undoubtedly controls in the present situation as it alone specifically addresses military detention in response to the 9/11 attacks. Therefore, like Milligan, the provisions of the Patriot Act are relevant only after it has been determined an individual does not constitute an enemy combatant — not before.
The particular errors in applying the AUMF lead to one transcendent flaw. By failing to give proper effect to the AUMF, the plurality has simply assumed the authority belonging to the legislative branch. The plurality states that Congress has not issued the “particularly clear statement ... necessary to authorize” al-Marri’s detention, ante at 238-39, but Congress has expressed its intentions quite plainly and emphatically, and to require more is to simply move the goal posts on the legislature. Courts cannot, under the guise of interpretation, require Congress to do what Congress has already done. To do otherwise vitiates the long accepted approach of Justice Jackson in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). See Samuel Issacharoff & Richard H. Pildes, Between Civil Libertarianism and Executive Unilateralism: An Institutional Process Approach to Rights During Wartime, 5 Theoretical Inquiries L. 1, 5-6 (2004) (explaining that the Court has long followed the Youngstown approach when faced with questions concerning the scope of the executive’s wartime authority); Cass R. Sunstein, Minimalism at War, 2004 Sup.Ct. Rev. 47, 83 (same). Under that rubric, the legality of executive action is fortified by congressional approval: “[w]hen the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum,” while, conversely, the President’s power is at its “lowest ebb” when he “takes measures incompatible with the expressed or implied will of Congress.” Youngstown, 343 U.S. at 635-37, 72 S.Ct. 863 (Jackson, J., concurring).
With its decision in this case, the plurality, in the guise of interpreting the AUMF, has stood the Jackson approach on its head. In doing so, it has ushered in a novel constitutional arrangement: now, rather than the judiciary respecting the lead of the elected branches in the most consequential of all democratic decisions— those of life and death during periods of war — the elected branches are told they must once more take steps they have already taken to protect the nation.
One searches Youngstown for the slightest hint of imprimatur for this new arrangement — but it is nowhere to be found. In Youngstown, the Court declared President Truman’s seizure of the nation’s steel mills unconstitutional, despite the President’s contention that the seizure was a necessary wartime measure. Id. at 583, 72 S.Ct. 863 (Opinion of the Court). While this demonstrates that the judiciary has a role, even during wartime, in making sure that the executive does not exceed its authority, one must not forget the force behind the Supreme Court’s decision: the fact that, as even President Truman “conceded,” his actions were not taken pursuant to a “congressional authorization.” Id. at 638, 72 S.Ct. 863 (Jackson, J., concurring); see also id. at 585, 72 S.Ct. 863 (Opinion of the Court) (“Indeed, we do not understand the Government to rely on *303 statutory authorization for [the] seizure.”). Youngstown has thus always stood for the proposition that the judiciary serves as an important check on the executive’s power when it acts without legislative approval.
What was absent when President Truman seized the nation’s steel mills is present here: clear and explicit legislative approval of the executive’s actions. By ignoring the plain text of the AUMF, the plurality ignores the teachings of Youngstown and negates the synchronized action of the President and Congress. It does this despite the fact that “it is difficult to conceive of an area of governmental activity in which the courts have less competence” than military affairs. Gilligan v. Morgan, 413 U.S. 1, 10, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973); see also Benjamin Wittes, Law and the Long War 103-04 (2008) (noting that “the judiciary’s capacity to design the kind of creative policies America needs in this conflict is exceptionally limited”); Mark Tushnet, Controlling Executive Power in the War on Terrorism, 118 Harv. L.Rev. 2673, 2679 (2005) (arguing that federal courts lack the capabilities necessary to determine “whether some particular response to a threat to national security imposes unjustifiable restrictions on individual liberty or is an unwise allocation of decisionmaking power”). Thus, the plurality’s approach is not only constitutionally problematic and patently undemocratic. It is dangerously unsound.
11. THE CRIMINAL JUSTICE SYSTEM IS NOT THE ONLY LAWFUL MEANS OF ADDRESSING THE TERRORIST THREAT.
Notwithstanding Congress’s explicit mandate authorizing the executive to detain all persons affiliated with the “organizations” that “planned” the 9/11 attacks, the plurality reaches a strikingly different conclusion: the Government cannot “subject them to indefinite military detention.” Ante at 217-18. The plurality holds that it is unlawful for the President to detain al-Marri without criminal process, and finds that the President must subject al-Marri to formal “charge[s], trial, and punishment in a civilian court.” Ante at 235. While the plurality seeks to pose the dispute as a mere matter of statutory interpretation, it goes well beyond that. By brushing aside the AUMF’s plain text and rejecting accepted notions of separation of powers, the plurality asserts its unabashed preference for using the criminal justice system in all instances involving suspected terrorists similarly situated to al-Marri.
Al-Marri and several amici express every bit as forcefully their preference for criminal prosecution in all instances. Al-Marri argues that he cannot be detained “without charge in civilian court” and that “[a]ll persons in the United States have the right to be charged and tried in a criminal proceeding for suspected wrongdoing.” Brief of Appellants at 15, 26. Likewise, several amici contend that the executive’s only option for detaining al-Marri is to bring formal charges through the criminal justice system. See, e.g., Brief for U.S. Criminal Scholars and Historians as Amici Curiae Supporting Appellants at 5 (arguing that “to the extent the government believes [al-Marri] acted against the welfare of the United States, it should proceed with criminal charges within the civilian justice system”); Brief for Center for National Security Studies et al. as Amici Curiae Supporting Appellants at 14-15.
In the alternative, al-Marri seeks, if not a criminal trial in name, then what is essentially a criminal trial in practice. Even if he may be detained by military authorities without a criminal charge, al-Marri claims that he is entitled to process *304 es that are part and parcel of a criminal prosecution, such as the right to discovery and “the right to confront and cross-examine witnesses in an evidentiary hearing.” Brief of Appellants at 11; see also Reply Brief of Appellants at 31-32; Brief for Professors of Evidence and Procedure as Amici Curiae Supporting Appellants at 12-26 (asserting that the Federal Rules of Evidence and the Due Process Clause render the Rapp Declaration inadmissible). These processes far exceed those suggested by the Supreme Court in Hamdi. See Hamdi 542 U.S. at 533-34, 124 S.Ct. 2633 (noting that in “enemy-combatant proceedings,” hearsay “may need to be accepted as the most reliable available evidence from the Government” and a “burden-shifting scheme” that includes a rebuttable “presumption in favor of the Government’s evidence” may be warranted).
Based on these various assertions, the only reasonable inference I can draw is that the plurality, as well as petitioner and his amici supporters, endorse a ringing preference for the criminal justice system to the exclusion of any other option for dealing with suspected al Qaeda associates apprehended on American soil. By defining the scope of the AUMF and the enemy combatant category so narrowly, it is hard to find anything other than a desire by the plurality to establish a requirement of criminal prosecution in almost every case.[2]
While I would be the first to agree that the criminal justice system retains an important place in our constitutional system when handling the terrorist threat, the notion that it is the only manner of dealing with such threats, or is constitutionally compelled in all cases involving apprehensions on American soil, is simply wrong. The democratic branches cannot be compelled to wage a struggle with so many of the attributes of war through the exclusive medium of the criminal justice system. Nothing in our constitution requires the elected branches to treat terrorism invariably as a criminal offense rather than as an act of belligerency. Indeed, such a constitutional approach would burden the Congress and the Executive to a greater extent than the war powers will allow. As discussed below, the prosecution of terrorists associated with organizations such as al Qaeda often presents intractable evi-dentiary and logistical difficulties. These difficulties underscore the fact that the judiciary has no right in the name of constitutional law to compel criminal prosecution of terrorist suspects in all instances. By forcing a particular approach over the wishes of Congress as expressed in the AUMF, the plurality undercuts the role of the legislative branch in allocating to the executive options to deal with the most dangerous al Qaeda members in our midst.
One wishes in vain for the plurality to evince some glint of recognition that two models exist to manage the threat presented by suspected terrorists: prosecuting them through the criminal justice *305 system or detaining them as enemy combatants. Neither approach alone will achieve the appropriate balance between individual liberty and national security. As such, judicial directives that the AUMF or the Constitution itself mandate reliance on the single model of criminal prosecution in all cases involving terrorism suspects is neither satisfactory nor tenable. Indeed, by formally routing all terrorist suspects apprehended in this country through the criminal justice system, the plurality has succeeded in impairing the warmaking powers of Article I and Article II. The warmaking powers conferred upon Congress and the Executive must likewise confer latitude in prosecuting or detaining those who wage war; else they are empty grants, bestowing the power without its necessary incidents. See Hamdi, 542 U.S. at 518, 124 S.Ct. 2633.
A.
I respect the aspiration that criminal prosecutions be the preferred way of addressing every threat that awaits the nation. But, as the Court and constitutional tradition have long recognized, this is not an ideal world, and not every threat to community safety can be handled by the criminal justice system.
The Framers attached profound importance to just criminal trials, and the Bill of Rights reflects their commitment. The Fourth, Fifth, Sixth, and Eighth Amendments grant all persons a number of protections against the coercive power of the government in the context of a criminal investigation and prosecution. The importance of these constitutional guarantees is consistent with a preference for using the criminal justice system to try and punish suspects.
This preference, however, is by no means absolute: the Constitution has never laid down a “categorical imperative” that the criminal justice system be the sole mode of apprehending suspected wrongdoers. United States v. Salerno, 481 U.S. 739, 748, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). For instance, pragmatic concerns of “community safety” may, in some circumstances, allow the executive to deprive an individual of liberty without a traditional criminal proceeding. See id. As the plurality properly recognizes, see ante at 223-24, this is true in contexts as diverse as the detention of dangerous suspects before a criminal trial, see Salerno, 481 U.S. at 755, 107 S.Ct. 2095 (adults); Schall v. Martin, 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984) (juveniles); the civil commitment of the mentally ill, see Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); and the confinement of recidivist sex offenders unable to control their behavior, see Kansas v. Hendricks, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997).
As the plurality acknowledges, each of the cases noted above constitutionally allows “detention based on process less than that attendant to a criminal conviction.” Ante at 223. Although the plurality mentions these examples, see id., it fails to recognize their import. In all of these cases, the Supreme Court acknowledged two key facts: first, a failure to act may leave unaddressed a serious threat to community safety and, second, special circumstances present significant barriers to criminal prosecution. As a result, the Court has consistently held that, in certain limited situations, the executive may use alternatives — such as military detention— to formal criminal charges so long as it does so pursuant to a proper legislative authorization. The plurality acknowledges this point, ante at 223-24 & n. 6 (citing cases), but, at the same time, refuses to recognize that the AUMF is just such an *306 authorization. By denying Congress’s clear intent in this manner, the plurality essentially mandates that the criminal justice system is the only tool for pursuing a struggle that, in Congress’s view, bears many of the salient characteristics of a modern war. This simply cannot be the case.
Indeed, the Court’s recognition of alternatives to criminal prosecution is not thought to compromise our constitutional values, and the plurality is wrong for suggesting that the present detention does just that. Though I recognize the detention at issue here is military rather than civil in nature, the relevant analysis is no different. This, at least, was the Supreme Court’s view in Boumediene, when it said that enemy combatant “proceedings need not resemble a criminal trial.” Boumediene, 128 S.Ct. at 2269. In fact, if anything, enemy combatants, such as al-Marri, present an even greater need for an alternative to the criminal justice system than do the categories of persons at issue in Salerno and Hendricks.
It is unquestionable that a failure to incapacitate individuals such as al-Marri may have dramatic consequences. As the plurality rightly notes, the law of war permits enemy combatants to be detained until the end of hostilities, in order to prevent their return to battle. See ante at 228 (quoting Hamdi, 542 U.S. at 519, 124 S.Ct. 2633). The same concern is present with those responsible for the 9/11 attacks. Indeed, there is evidence that suspected combatants released by the United States have subsequently been found fighting against American troops in Afghanistan. See John Mintz, Released Detainees Rejoining the Fight, Wash. Post, Oct. 22, 2004, at Al. Moreover, the risks of failing to restrain an enemy combatant are even more pronounced when the combatant is a suspected terrorist like al-Marri. Rather than return to a foreign battlefield, al-Marri, upon his release, may well resume his efforts to launch a catastrophic attack against American interests either on U.S. soil or abroad. See Cass R. Sunstein, National Security, Liberty, and the D.C. Circuit, 73 Geo. Wash. L.Rev. 693, 702 (2005) (noting that the costs of error when dealing with terrorism “may turn out to be disastrous rather than merely harmful”).
B.
There exists not only the obvious need to immobilize enemy combatants, particularly suspected terrorists; there are also often serious barriers to their criminal prosecution. To begin, the arrest of terror suspects will sometimes necessarily be based on evidence that does not meet the constitutional and statutory requirements of a traditional criminal proceeding. The “fog of war” creates confusion, and, in active combat zones such as Afghanistan and Iraq, it is often difficult to respect the evidentiary standards, such as an unbroken chain of custody, that are the hallmarks of criminal trials. See Ruth Wedgwood, Al Qaeda, Terrorism, and Military Commissions, 96 Am. J. Int’l L. 328, 330-31 (2002). In addition, it will often be implausible to allow a terror suspect to confront the witnesses against him because of the difficulties in having American combat personnel leave the front lines to testify. See, e.g., Hamdi, 542 U.S. at 531-32, 124 S.Ct. 2633.
While the plurality implicitly recognizes, as it must under Hamdi, that such eviden-tiary problems support the detention of enemy combatants who have fought on a battlefield, it inexplicably limits that detention to those who have battlefield experi *307 ence.[3] In reaching this conclusion, the plurality fails to realize that some of the significant difficulties associated with criminal prosecution are equally present when a suspected terrorist has never been on a foreign battlefield. Indeed, these obstacles are present both before and during trial.
For instance, pretrial protections afforded criminal defendants, such as a right to a speedy trial and the immediate assistance of counsel, may hinder the government’s need to gather information that could save hundreds, if not thousands, of lives. While all agree that “indefinite detention for the purpose of interrogation” is not allowed, Hamdi, 542 U.S. at 521, 124 S.Ct. 2633, and torture must not be tolerated under any circumstance, this does not negate the fact that terror suspects are likely the “best source of information” on how to prevent future terrorist attacks. See William J. Stuntz, Local Policing After the Terror, 111 Yale L.J. 2137, 2162 (2002). Obviously, this information will often be accessible only after interrogation. See id. at 2161-62. And interrogation, particularly effective non-torturesome interrogation, typically takes time and may necessitate “[h]olding a terrorist suspect incommunicado.” See Richard A. Posner, Not a Suicide Pact: The Constitution in a Time of National Emergency 63 (2006). Thus, even if the government has no plans to interrogate a terror suspect indefinitely, the criminal justice system may impede the ability to gather critical information, even in the short term, because of a criminal suspect’s pretrial rights.
The problems presented by the criminal prosecution of terrorists are even more pronounced at trial. Of course, there is a strong argument for bringing all suspected terrorists to trial: a trial conducted pursuant to the open and public requirements of the criminal justice system provides a showcase of American values and demonstrates our commitment to fairness for even the most pernicious members of society. See Michael German, Trying Enemy Combatants in Civilian Courts, 75 Geo. Wash. L.Rev. 1421,1426 (2007). But while the benefits of a criminal trial may carry the day in most instances, I do not believe that the argument is so one-sided as to rule out the ability of Congress to adopt other approaches. This is because the public prosecution of a suspected terrorist entails several serious problems.
First, while a showcase of American values, an open and public criminal trial may also serve as a platform for suspected terrorists. Terror suspects may use the bully pulpit of a criminal trial in an attempt to recruit others to their cause. Likewise, terror suspects may take advantage of the opportunity to interact with others during trial to pass critical intelligence to their allies. For instance, before his appointment as Attorney General, former federal Judge Michael B. Mukasey recounted the story of how, “in the course of prosecuting Omar Abdel Rahman (the so-called ‘blind sheik’) and others for their role in the 1993 World Trade Center bombing and other crimes, the government was compelled ... to turn over a list of unindicted co-conspirators to the defendants.” Michael B. Mukasey, Jose Padilla Makes Bad Law, Wall St. J., Aug. 22, 2007, at A15. One of those co-conspirators, it turns out, was Osama bin Laden. Within ten days, a copy of the list was in bin Laden’s hands, “letting him know that his *308 connection to that case had been discovered.” Id.
Second, and relatedly, the prosecution of some terrorists could present security concerns of a different sort: witnesses and jurors may be subjected to threats of violence or become the targets of attack. The willingness of terrorist organizations to retábate against civilian participants in a terrorist trial cannot be overlooked. A1 Qaeda has already “carried out a mass killing abroad and left a written message stating that the killing was in retaliation for the actions of [a] federal trial judge.” Wedgwood, supra, at 331. It is not unreasonable to believe that such a ruthless organization could easily target the trial participants themselves in the future. See 18 U.S.C. § 1512 (2000) (prohibiting tampering with a witness, victim, or informant).
To place jurors and witnesses in this sort of danger goes far beyond the price that we fairly ask citizens to pay as responsible members of a free society. For while it may of course be possible to protect jurors and witnesses during trial, it likely will prove very difficult to fully protect them after a trial has been concluded. See Wedgwood, supra, at 331. The plurality, by insisting on criminal prosecution in nearly all instances, fails to consider that a highly publicized international terror trial may perfectly suit the interests of an organization, such as al Qaeda, that thrives on propaganda and intimidation.
Third, and finally, the plurality also neglects to discuss another serious concern: traditional criminal proceedings, especially public trials, may not be responsive to the executive’s legitimate need to protect sensitive information. Neither the plurality nor anyone else suggests that suspected terrorists, such as al-Marri, are arrested pursuant to anything other than intelb-gence of the most sensitive sort.
If such highly classified intelligence were disclosed to suspected terrorists, the consequences would be devastating. Any further use of that intelligence to either prevent future attacks or capture other suspected terrorists would be jeopardized, if not lost. Moreover, the loss of secrecy would place the sources of sensitive information in danger of reprisal. It is for these reasons that the Court has recognized that the “[government has a compelling interest in protecting ... the secrecy of information important to our national security.” CIA v. Sims, 471 U.S. 159, 175, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985) (quoting Snepp v. United States, 444 U.S. 507, 509 n. 3, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (per curiam)) (internal quotation marks omitted).
However, the government’s desire to protect such sensitive intelligence may conflict with a defendant’s confrontation and compulsory process rights. By employing those rights, a terror suspect like al-Marri may, in a tactic commonly referred to as “graymail,” request highly sensitive materials. See William H. Simon, The Ethics of Criminal Defense, 91 Mich. L.Rev. 1703, 1705 (1993). Such a request leaves the government facing a Hobson’s Choice. The government can withdraw all or part of its case to protect its information, or proceed and surrender its sensitive intelligence and possibly its source. And even if the government is able to suppress the defendant’s request, defense counsel will be able to insinuate that the government is hiding information that is favorable to the defendant.
I do not suggest these concerns should carry the day. But Congress may certainly take them into account in deciding that the criminal justice system is not the sole permissible means of dealing with suspected terrorists. In light of these concerns, it seems apparent that the criminal justice *309 system may be ill-suited to deal with the unique problems presented by the prosecution of terrorists such as al-Marri. This, at least, was the calculus of Congress in passing the AUMF. By ignoring these concerns and the clear text of the AUMF, however, the plurality sends the unmistakable message that the criminal justice system is the unquestioned template for dealing with domestic terrorists, regardless of the consequences.
C.
To be sure, corrective measures have been adopted by Congress to alleviate many of the problems presented by the criminal prosecution of suspected terrorists. For instance, the Classified Information Procedures Act was specifically designed to handle classified information in the course of a criminal proceeding in a manner that balances the legitimate need of national security against the legitimate need for the assertion of basic rights. See Classified Information Procedures Act (“CIPA”), 18 U.S.C. app. Ill §§ 1-16 (2000); see also United States v. Fernandez, 913 F.2d 148 (4th Cir.1990). Courts and parties have become familiar with the customary tools employed in these cases, such as in camera hearings, redactions, and placing information under seal. In addition to such statutory measures, there is also case law designed to balance a variety of pressing governmental interests with a defendant’s criminal process rights. See, e.g., Maryland v. Craig, 497 U.S. 836, 853, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) (balancing the state’s “interest in the physical and psychological well-being of child abuse victims” against a defendant’s desire for face-to-face confrontation); Roviaro v. United States, 353 U.S. 53, 62, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957) (holding that the determination of whether an informant’s identity must be disclosed requires “balancing the public interest in protecting the flow of information against the individual’s right to prepare his defense”).
But if the plurality’s insistence on using the criminal justice system to prosecute all domestic terrorists rests on the presence of corrective measures such as CIPA, it must also recognize that these corrective measures are not always available and, even when available, are not able to address every difficulty. Despite CIPA’s purpose, it is not a panacea for the problems presented by the criminal prosecution of some suspected terrorists. This is because CIPA does not pretend to overcome all limitations on the judicial perspective. Because courts understandably tend to be focused on the specific cases before them (that is, after all, the nature of the judicial process), there is a risk that they, understandably, will fail to appreciate the broader dangers associated with a potentially sensitive piece of information. See Sims, 471 U.S. at 176, 105 S.Ct. 1881 (explaining that judges have “little or no background in the delicate business of intelligence gathering” and that “[tjhere is no reason ... to have great confidence in the ability of judges to make” intelligence-related judgments correctly).
And there is no guarantee that even the most conscientious attempts to protect classified information will always be effective. For instance, during the criminal trial of Ramzi Yousef, “an apparently innocuous bit of testimony in a public courtroom about delivery of a cell phone battery was enough to tip off terrorists still at large that one of their communication links had been compromised.” Mukasey, supra, at A15. Given al Qaeda’s ambitions, such mistakes have ramifications that last far beyond a specific trial — mistakes Congress sought to prevent in granting the President the authority to detain enemy combatants under the AUMF, and mistakes *310 the plurality fails to acknowledge when suggesting that the criminal justice system is the only model for dealing with al-Marri and those similarly situated.
In the long run, the plurality’s preference for making the criminal justice process the exclusive vehicle for dealing with domestic terrorism may disserve nothing so much as the criminal justice system itself. In adopting corrective measures to deal with the unique problems presented by terrorism prosecutions, courts may dilute the core protections of the criminal justice system in other cases. In the past, the “urgency involved in terrorism cases” has “led courts to accept conduct by the government that might well have been disapproved in other contexts.” John Farmer, A Terror Threat in the Courts, N.Y. Times, Jan. 13, 2008, § 4, at 14. Furthermore, in order to effectively prosecute terrorists, courts have been much more willing to extend the “reach” of material witness and conspiracy statutes “to conduct that has never before been punishable as a crime.” Id.
It is naive to think that this sort of dilution of our procedural and substantive criminal law will have no effect on the prosecution of criminal suspects who are not terrorists. The government will seek to take advantage of “terrorist precedents” in other cases. Thus, despite the plurality’s protestations to the contrary, the best way to maximize liberty for all may in fact be to minimize the instances when such dilutions of criminal process are needed in the first place.
The unintended consequences of the plurality’s insistence on the criminal justice model do not end with the dangers of dilution. In pushing for the full panoply of criminal process for all suspected terrorists arrested in this country, the plurality risks pushing the executive, understandably intent on protecting the nation, in a more extreme direction. The difference between the elaborate procedural protections required by the plurality in the United States and those required elsewhere will give the executive branch the incentive to pursue more extraterritorial detentions and more acts of rendition — not because these actions are necessarily dictated by the struggle against terror but because of the disparities between refined procedural regimes at home and more rudimentary ones abroad. It is far better for true liberty to seek some balance between criminal prosecution and military detention for suspected terrorists in this country than to pursue the plurality’s one-sided path.
To sum up, while corrective measures such as CIPA are possible and adaptations in criminal procedures have certainly been undertaken, the fact remains that prosecutions of terrorist suspects have frequently proven to be difficult, both as a practical and logistical matter and as a broader gauge of what the judiciary’s proper role should be on matters touching quite intimately on the conduct of war. It is often argued that these difficulties are nothing more than a function of the fact that these post-9/11 cases are ones of first impression. This is only partly true. These difficulties are inherent, and no accumulation of experience is going to make the underlying evidentiary dilemmas and problems go away.
Moreover, it cannot be forgotten that CIPA was enacted by Congress to apply to criminal prosecutions, not to military detentions. See, e.g., 18 U.S.C. app. Ill § 8 (stating that the protections of CIPA are designed to “prevent unnecessary disclosure of classified information involved in any criminal proceeding” (emphasis added)). There has been no indication from Congress that CIPA should be extended wholesale beyond its original scope, and we therefore should not do so here. Like *311 wise, it cannot be forgotten that Congress passed the AUMF fully cognizant of CIPA and other available corrective measures. When Congress authorized the use of necessary force, including the military detention of enemy combatants such as al-Marri, it did so knowing full well that other alternatives were possible. Nevertheless, it authorized the President, when “appropriate,” to detain enemy combatants, a power long recognized as a fundamental incident of waging war. This authorization must not be undermined, as the plurality attempts, through judicial subversion in the name of criminal process. See William H. Rehnquist, All the Laws But One: Civil Liberties in Wartime 205 (1998) (stating that “[j]udicial inquiry” is “ill-suited” to address issues of “military necessity”).
Thus, while many terrorist threats can and should be treated through the criminal justice system, that preference should by no means be absolute. Indeed, it has never been the case that the criminal justice system is used to the exclusion of all other forms of detention. By effectively reducing the legislature’s allocation of detention options to the executive and all but directing that our government deal with such threats in a single, invariable manner, the plurality is not just wrong, but dangerously so. For the reasons discussed above, it is neither practical nor possible to prosecute all terrorism suspects using the criminal justice system. And it is not constitutionally required.
D.
I do not wish to be misunderstood. If the prosecution of suspected terrorists is simply not possible in all circumstances, neither is the use of military detention. While the ability to detain eliminates many of the problems associated with criminal prosecution, open-ended detention is not an acceptable way to conform our historic commitments to liberty to the exigencies of this different kind of conflict.
Under the military detention model, the President may detain enemy combatants without trying them in the criminal justice system. See Hamdi, 542 U.S. at 516-23, 124 S.Ct. 2633. This is an awesome power and, as such, must be properly circumscribed. Detainees are not afforded the full protections of the Bill of Rights or the Federal Rules of Criminal Procedure, and the executive’s actions are not subject to the accountability that is inherent in the criminal justice system. See, e.g., Harold Hongju Koh, The Case Against Military Commissions, 96 Am. J. Int’l L. 337, 338-42 (2002).
To turn every crime that might be tenuously linked to terrorism into a military matter would breach this country’s most fundamental values. Our acceptance of jurisdiction in al-Marri’s case bespeaks the recognition that indefinite detention with no prospect of review is not an option. Such a broad extension of the executive’s detention powers would suspend not only the Constitution, but the very essence of liberty itself.
The hard question is thus not between a full-blown prosecution and an unsupervised detention. The hard question involves the identification of those who must be formally charged and prosecuted in the traditional manner and those who may be detained pursuant to more limited procedures set forth by congressional proclamation or Supreme Court precedent. See, e.g., Hamdi 542 U.S. at 524-39, 124 S.Ct. 2633 (detailing procedures that must be afforded American citizens detained as enemy combatants).
The dilemma thus is clear: while we have a constitutional preference for traditional criminal proceedings, the prosecution of many terror suspects presents un *312 precedented challenges. Conversely, while the ability to detain avoids many of the problems inherent in the criminal justice system, the threat to liberty presented by executive detention commands that it be carefully circumscribed. The choice of which path to take is anything but easy, and the plurality and al-Marri are absolutely wrong to suggest otherwise.
Instead, there must be a set of criteria that enable us to identify when military detention is a constitutionally permissible option. This is what I shall try to do in Section III. These criteria must endeavor to respect the preference for the criminal justice system to the extent possible, while not compromising the unquestioned constitutional prerogative of Congress and the executive to wage war and ensure the security of this nation and its people.
III. THE DETENTION OF AL-MAR-RI IS CONSISTENT WITH THE LIMITS ESTABLISHED BY OUR CONSTITUTION ON THE MILITARY DETENTION OF THOSE LAWFULLY ON AMERICAN SOIL.
The text of the AUMF clearly authorizes al-Marri’s detention. Our inquiry cannot end here, however. There are constitutional limits on what Congress can authorize the executive to do. Those limits must respect both the legitimate operation of the war powers and simultaneously protect against their abuse — for military detentions that bear no relationship to the conduct of war serve only to erode the basic charter of our rights. Those of us who believe the AUMF applies simply cannot avoid the serious constitutional issues that result. Because Congress plainly cannot authorize the President to sweep people off the street without a constitutional basis for doing so, we must also address whether “the Constitution permits” Congress to authorize the military detention of someone, such as al-Marri, who was lawfully residing in this country when seized on American soil. Boume-diene v. Bush, 128 S.Ct. at 2271-72.
At some point the obligation arises not just to ask whether, but why — as in why the military detention of those lawfully in this country is a constitutionally permissible exercise. And not just why, but when — as in when the detention of lawful residents is permissible, and when it is not. If the basic “wh” questions do not arise in this case, then I doubt they ever will. The American constitutional tradition is not consonant with the prospect of martial law in other than necessitous circumstances. See U.S. Const, art. I, § 9, cl. 2; Ex parte Milligan, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866); see also The Posse Comitatus Act, 18 U.S.C. § 1385 (2000). But the American constitutional tradition likewise does not countenance judicial interference in democratic efforts to ward off war’s gravest dangers. See U.S. Const, art. I, § 8, cl. 11-16; id. at art. II, § 2, cl. 1; Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635-37, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (granting presidential action taken pursuant to a congressional authorization “the widest latitude of judicial interpretation”) (Jackson, J., concurring). So our obligation becomes one of treading carefully, lest we cross lines without reflection.
It is here I believe the plurality falls short. By interpreting the AUMF in a manner so plainly contrary to its text, the plurality all but states that Congress is devoid of any constitutional authority to authorize detention of al-Marri. Indeed, it proclaims that the application of the AUMF to allow the military detention of an individual apprehended on American soil and with no foreign battlefield experience “would have disastrous consequences for the Constitution — and the country.” *313 See ante at 252-53. In holding the AUMF not to authorize al-Marri’s detention in the face of a plain textual instruction otherwise, the plurality lays bare its constitutional misgivings about this detention. In fact, the plurality suggests as much by noting the “constitutional concerns” and “serious constitutional questions” that would attend an interpretation of the AUMF that permits the detention of persons such as al-Marri. Ante at 226.
So the plurality proposes to avoid all these issues. The plurality is surely right that, “whenever possible,” a statute such as the AUMF should be construed to avoid “serious constitutional problems.” Ante at 244-45 (internal quotation marks omitted). But there is a limit to the extent to which courts may disregard statutory text in the name of ducking difficult constitutional questions. As Boumediene puts it: “The canon of constitutional avoidance does not supplant traditional modes of statutory interpretation .... We cannot ignore the text and purpose of a statute in order to save it.” Boumediene, 128 S.Ct. at 2271. Several members of this court have made clear that the AUMF simply cannot be read in the manner the plurality proposes. Our basic task remains that of giving a text some semblance of the meaning that Congress intended for it, and the doctrine of constitutional avoidance does not absolve us of that duty.
Thus, in the name of constitutional avoidance, the plurality has denied the AUMF its plain effect. At the same time, however, the government has failed to develop principled limitations on its position, thus causing concern that the executive is seeking an authority that is uncomfortably open-ended. See Hamdi, 542 U.S. at 516, 124 S.Ct. 2633 (noting that “the Government has never provided any court with the full criteria that it uses in classifying individuals as” enemy combatants). Because no absolute approach is tenable, there must be appropriate criteria for determining when the government may constitutionally detain a suspected terrorist as an enemy combatant. This is consistent with the Supreme Court’s plurality opinion in Hamdi v. Rumsfeld, 542 U.S. 507, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004).[4]
The “threshold question” in Hamdi was “whether the Executive has the authority to detain citizens who qualify as ‘enemy combatants.’ ” Id. at 516, 124 S.Ct. 2633. The Court found that the AUMF did authorize the President to engage in the “fundamental incidents] of waging war.” Id. at 519, 124 S.Ct. 2633. This, the Court explained, included the military detention of persons properly classified as enemy combatants. Id. at 518-19, 124 S.Ct. 2633 (quoting Ex parte Quirin, 317 U.S. 1, 28, 30, 63 S.Ct. 2, 87 L.Ed. 3 (1942)).
The Court then addressed who was an enemy combatant. Rather than delineate the term’s full scope, the Court answered only the “narrow question” of whether Hamdi, based on the facts alleged, qualified as an enemy combatant. Hamdi, 542 U.S. at 516, 124 S.Ct. 2633. The Court held that someone who was “part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict against the United States there,” could be *314 treated as an enemy combatant. Id. (internal quotation marks omitted).
The plurality has consistently overread Hamdi, to the effect that only those engaged in armed conflict on a foreign battlefield fall into the enemy combatant category. See ante at 227-30. But that is not at all what Hamdi said. Recognizing “[t]here is some debate as to the proper scope of this term,” 542 U.S. at 516, 124 S.Ct. 2633, Hamdi observed that the “legal category of enemy combatant has not been elaborated upon in great detail,” id. at 522 n. 1, 124 S.Ct. 2633. Instead, “[t]he permissible bounds of the category will be defined by the lower courts as subsequent cases are presented to them.” Id.
This is such a case. Because al-Marri’s case raises such fundamental questions about the executive’s power to militarily detain suspected terrorists lawfully residing in this country, it imposes the obligation to examine the precise contours of the enemy combatant category and to develop a framework for determining who under our Constitution may be lawfully detained.[5]
My analysis thus begins with an examination of traditional law of war principles that must underlie any understanding of the enemy combatant category (subsection A). Next, I shall explain how these principles have consistently accommodated changes in the conduct of war and in international relations (subsection B). I shall then discuss the recent changes associated with the war on terrorism, namely the threat of stateless actors who primarily target innocent civilians and may come to possess weapons of mass destruction (subsection C). Based on the principles underlying the law of war and in light of the new circumstances in this particular conflict, I will elucidate what I believe to be the proper criteria for determining who may qualify constitutionally as an enemy combatant (subsection D) and demonstrate that these criteria are consistent with existing Supreme Court and circuit precedent on the matter (subsection E). Finally, I will apply these criteria to the facts of al-Marri’s detention (subsection F). I can discern no shortcut to this inquiry. Indeed, I think this is the only way to approach and resolve al-Marri’s case.
A.
At first glance, any discussion of traditional law of war principles may seem quite antique. These principles are rooted in times long past, when war was synonymous with classic battlefield combat engaged in by the uniformed armies of rival nation-states. Our current enemy has, of course, shown only contempt for long-established rules of armed conflict. Nevertheless, the law of war remains of primary importance in determining the proper contours of the enemy combatant category. *315 This is true for two reasons. First, as the Court explained in Hamdi, “longstanding law-of-war principles” should inform our understanding of the AUMF and, therefore, the scope of the President’s power to detain enemy combatants in the current conflict. See Hamdi, 542 U.S. at 521, 124 S.Ct. 2633; see also ante at 228 (stating that “American courts have repeatedly looked to ... the law of war in identifying which individuals” are enemy combatants). Second, and more fundamentally, traditional law of war principles are consistent with the belief that indiscriminate detention is antithetical to constitutional norms and cannot be tolerated under our system of justice.
Thus, while I do not claim any special expertise in the law of war and its history, I begin my analysis by looking to “longstanding law-of-war principles.” Although there are those far more knowledgeable about these matters than am I, certain rudimentary principles do suggest themselves and, as the Supreme Court has indicated, these principles provide context and assistance for the inquiry at issue here.
The law of war is not binding of its own force, but rather informs our understanding of the war powers in Articles I and II and of the enemy combatant category. The law of war likewise serves as a source of guidance during times of armed conflict, and courts look to the law of war when interpreting the content and scope of a congressional authorization to use military force, such as the AUMF. See, e.g., Hamdi, 542 U.S. at 518-19, 124 S.Ct. 2633; Ex parte Quirin, 317 U.S. 1, 30-31 & n. 7, 63 S.Ct. 2, 87 L.Ed. 3 (1942); Padilla v. Hanft, 423 F.3d 386, 391 (4th Cir.2005). Indeed, the “generally accepted view” is that “a broad and unqualified authorization to use force empowers the President to do to the enemy what the laws of war permit.” Curtis A. Bradley & Jack L. Goldsmith, Congressional Authorization and the War on Terrorism, 118 Harv. L.Rev. 2047, 2093 (2005).
The law of war represents a “distinct canon of the Law of Nations.” William Winthrop, Military Law and Precedents 773 (2d. ed., Beard Books 2000) (1896). In the United States, it “encompasses all international law for the conduct of hostilities binding on the United States or its individual citizens, including treaties and international agreements to which the United States is a party, and applicable customary international law.” Dep’t of Defense, DoD Law of War Program, DoD Directive 2311.01E, sec. 3.1 (May 9, 2006), available at http://www.fas.org/irp/doddir/ dod/d2311_01e.pdf; see also Jack M. Beard, The Geneva Boomerang: The Military Commissions Act of 2006 and U.S. Counterterror Operations, 101 Am. J. Int’l L. 56, 56 n. 5 (2007) (quoting the DoD Directive).
1.
Several principles animate the law of war. Foremost among them is the cardinal principle of discrimination, which seeks to minimize the unnecessary destruction of life and property that results from “purposeless or wanton violence.” Michael Walzer, Just and Unjust Wars 129 (3d ed.2000). The principle of discrimination requires warring nations to limit their military targets to those persons who actually pose a military threat. At the same time, it allows warring nations to detain those who do represent a military threat, ensuring that such persons, but only those persons, are removed from the field of conflict. While mistakes are inevitable in the often confused environment that is warfare, the principle of discrimination recognizes the indisputable value, even in wartime, of sparing innocent life.
*316 This principle of discrimination is effectuated through the category of “enemy combatant.” Only “enemy combatants” may be the intended targets of military force or militarily detained. Two major distinctions define the enemy combatant category: (1) the distinction between enemies and non-enemies and (2) the distinction between combatants and non-combatants. See, e.g., Walzer, supra, at 135-37; Bradley & Goldsmith, supra, at 2107-16.
The first level of classification determines who qualifies as the “enemy.” Traditionally, the definition of “enemy” has been state-based: after the United States declares war on another nation, all residents of that country are deemed enemies of the United States. Lamar v. Browne, 92 U.S. 187, 194, 23 L.Ed. 650 (1875) (“In war, all residents of enemy country are enemies.”); In re Territo, 156 F.2d 142, 145 (9th Cir.1946) (same). A country’s enemies include “not merely the opposed military forces but all the inhabitants of the belligerent nations or districts.” Winthrop, supra, at 776. Consequently, those who reside in neutral countries, even if politically, but not militarily, sympathetic to the enemy nation, are immune from detention and targeting by military forces.
After determining that a person is an “enemy,” the second level of classification distinguishes combatants from non-combatants. “By universal agreement and practice, the law of war draws a distinction between the armed forces and the peaceful populations of belligerent nations.” See Quirin, 317 U.S. at 30-31, 63 S.Ct. 2. Indeed, the “distinction between combatants and civilians is a cardinal principle of the law of war.” Beard, supra, at 60.
Combatants have traditionally included “most members of the armed forces,” Bradley & Goldsmith, supra, at 2114, and those “who associate themselves with the military arm of the enemy government,” Quirin, 317 U.S. at 37, 63 S.Ct. 2. The paradigmatic example of a combatant is a soldier who actively serves in his nation’s military. See Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of International Armed Conflicts art. 43(2), June 8, 1977, 16 I.L.M. 1391 (hereinafter “Protocol I”) (stating that “[mjembers of the armed forces of a Party to a conflict” are “combatants”). However, “surgeons, assistants and employees charged with the care and transport of the wounded on the field,” even if they are formally part of the country’s military organization, generally have not been considered combatants. Winthrop, supra, at 779; Richard J. Re-gan, Just War: Principles and Cases 89 (1996) (noting that “the law of nations and international conventions prohibit attacks on medical military personnel”); see also Military Commissions Act of 2006, Pub.L. No. 109-366, § 950v(a)(2)(C), 120 Stat. 2600, 2625 (classifying “military medical or religious personnel” as “protected person[s]”).
Several factors have traditionally been considered relevant to the determination of whether someone is a combatant. These include an individual’s “self-identification through the wearing of a uniform or some other distinguishing characteristic” and “participation within the command structure of a party to the conflict.” Bradley & Goldsmith, supra, at 2114; see also Military Commissions Act of 2006, Pub.L. No. 109-366, § 948a(2)(B), 120 Stat. 2600, 2601 (including the “wear[ing] [of] a fixed distinctive sign recognizable at a distance” and being “under responsible command” as part of the determination of “lawful enemy combatant”); Geneva Convention Relative to the Treatment of Prisoners of War art. 4, Aug. 12,1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 (hereinafter “Third Geneva Convention”). A person’s presence on a *317 battlefield has also been considered particularly relevant to the combatant determination. See, e.g., Padilla, 423 F.3d at 391— 92 (citing Hamdi, 542 U.S. at 522 n. 1, 124 5.Ct. 2633).
No single factor must exist in order to qualify a person as a combatant, however. For instance, the Supreme Court has made clear that an individual may be a combatant even if he is not acting on the battlefield. In Quiñn, the Court held that the petitioners, who had buried their military uniforms after secretly arriving in the United States, were no “less belligerents [i.e. combatants]” even if they had “not actually committed or attempted to commit any act of depredation or entered the the-atre or zone of active military operations.” 317 U.S. at 38, 63 S.Ct. 2. The failure of the plurality to appreciate this aspect of Quirin results in a faulty premise. The plurality mistakenly presumes that in order to be an enemy combatant, an individual must have been present, at one time or another, on an active battlefield. See ante at 231 (finding that al-Marri was not an enemy combatant because, among other reasons, he was “not alleged to have been on the battlefield during the war in Afghanistan”). Quirin makes plain the concept of a combatant is much broader.
Likewise, a person’s citizenship status is not determinative of his combatant status. The plurality discusses at length the fact that al-Marri, as an alien who lawfully entered the United States, receives “certain [legal] protections — including those rights guaranteed by the Due Process Clause” — while within the United States. Ante at 222. The plurality emphasizes this point to demonstrate that allowing the detention of al-Marri, a lawful alien, would also permit the detention of American citizens. See, e.g., ante at 217 (arguing that the detention of al-Marri would also allow the “military detention of a similarly situated American citizen”); id. at 222 (noting that “the Due Process Clause protects not only citizens but also aliens”); id. at 235 (noting that “even ordinary American citizens” could be detained).
Once again, the plurality has indefensibly narrowed the concept of a combatant. Any implication that an individual’s citizenship status prevents his detention as an enemy combatant also runs directly afoul of the Supreme Court’s holding in Quirin. Quirin makes clear that the law of war trumps any claim based on American citizenship: “Citizenship in the United States of an enemy belligerent [i.e. combatant] does not relieve him from the consequences of a belligerency which is unlawful because in violation of the law of war.” 317 U.S. at 37-38, 63 S.Ct. 2.
2.
Depending on one’s status as a combatant or non-combatant, different rights and obligations attach.[6] For instance, combatants are the only ones who may legitimately carry out “the operations of war,” namely the use of force. Winthrop, supra, at 778. Consequently, only they may lawfully kill the opposing forces. However, in exercising this awesome power, combatants may only target fellow combatants. And, of course, “once war has begun,” combatants may be “attacked] at any time (unless they are wounded or captured).” Walzer, supra, at 138.
Combatants are also required to follow the laws of war. Offenses against the law of war may be defined by Congress, see *318 U.S. Const, art I., § 8, cl. 10, or based on “the common law of war,” see Hamdan v. Rumsfeld, 548 U.S. 557, 126 S.Ct. 2749, 2780, 165 L.Ed.2d 723 (2006). Offenses include “engaging in illegal warfare as a guerilla,” “acting as a spy,” “abuse or violation of a flag of truce,” disguising oneself in the uniforms of the opposing forces, and the “unlawful, unreasonably harsh, or cruel, treatment of prisoners.” Winthrop, supra, at 785, 791, 839^40; see also Quirin, 317 U.S. at 35-37, 63 S.Ct. 2 (holding that persons who “pass surreptitiously from enemy territory into our own, discarding their uniforms upon entry, for the commission of hostile acts involving destruction of life or property, have the status of unlawful combatants punishable as such by military commission”); Military Commissions Act of 2006, Pub.L. No. 109-366, § 950v(b), 120 Stat. 2600, 2626-30 (defining twenty-eight offenses that are triable by military commission as law of war offenses); Third Geneva Convention art. 3.
If a combatant acts in accordance with the law of war, he is a lawful combatant and entitled to the rights thereof. This includes being treated as a prisoner of war if captured. See Third Geneva Convention; Regan, supra, at 88. Because lawful combatants are simply following the orders of their belligerent nation, the law of war dictates that they not be punished for their role in the hostilities. Third Geneva Convention art. 13 (“Measures of reprisal against prisoners of war are prohibited.”); Winthrop, supra, at 791. Instead, they are held as prisoners of war, treated humanely, and released or returned to their home country when the conflict is over. See Third Geneva Convention art. 13 (“Prisoners of war must at all times be humanely treated.”); Hamdi, 542 U.S. at 520, 124 S.Ct. 2633; Winthrop, supra, at 790 (noting that captured lawful combatants must be “treated with humanity” and “on the same footing as regards food and clothing as the troops of the Government who made them prisoners”).
If a combatant violates the law of war, however, he becomes an unlawful combatant. Unlawful combatants “are subject to trial and punishment by military tribunals for acts which render their belligerency unlawful.” Quirin, 317 U.S. at 31, 63 S.Ct. 2; see also Johnson v. Eisentrager, 339 U.S. 763, 786, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) (noting that the “jurisdiction of military authorities, during or following hostilities, to punish those guilty of offenses against the laws of war is long-established”). Unlawful combatants are to be tried by military commissions. See Military Commissions Act of 2006, Pub.L. No. 109-366, § 948c, 120 Stat. 2600, 2602 (establishing military commissions for alien unlawful enemy combatants); Hamdan, 126 S.Ct. at 2775-78. After trial by military authorities, unlawful combatants may be punished in any number of ways, including imprisonment or death. Winthrop, supra, at 842^43.
Non-combatants also have unique rights and obligations under the law of war. First and foremost, civilians should not “be the objects or the targets of military activity,” Walzer, supra, at 151, and “[e]xcept where unavoidable,” they “are not to be involved in injury to life, person, or property,” Winthrop, supra, at 778; Protocol I, art. 51. Those who violate this “rule of immunity of non-combatants ... become liable to the severest penalties as violators of the laws of war.” Winthrop, supra, at 779.
In light of this immunity from the brunt of armed conflict, civilians have a related obligation to not “take a direct part in hostilities.” Protocol I, art. 51(3). If a non-combatant does take a direct part in the conflict, he forfeits his status as a civilian and may be treated as an unlawful *319 combatant.[7] See Bradley & Goldsmith, supra, at 2115.
3.
The above is no more than a concise presentation of the classical model of the laws of war. No one is so naive as to believe that the classical model governs the behavior of all warring parties. The classical model often cracks under the strain of actual warfare, as the devastation to civilians in World War II, among other things, bears full testament. And, as was plain from 9/11, al Qaeda and other terrorists hold the laws of war in open contempt. Thus, the classical model is not introduced to suggest guidelines to which warring parties in fact adhere or standards that would subject the conduct of war in this country to pervasive litigation.
Instead, I discuss the classical model for a discrete and narrow purpose. The attacks of 9/11 left this country on the horns of a dilemma: between having our hands tied with Marquess of Queensberry rules and being so indifferent to the law of war that we ourselves became a rogue and lawless nation. The Supreme Court, in attempting to alleviate this tension, suggested that the law of war serves as a useful guide as to whom the President may constitutionally detain. See Hamdi, 542 U.S. at 518, 521, 124 S.Ct. 2633. In other words, an understanding of the traditional law of war is the first step in defining the concept of an enemy combatant.
In sum, the law of war has historically classified individuals during times of armed conflict into one of several categories. The process of classification involves two major steps. The first inquiry is whether a person is an enemy. If so, the second inquiry is whether that person is a combatant or a civilian. Different rights attach depending on these classifications. Most importantly for our purposes, only enemy combatants, both lawful and unlawful, (and civilians who take a direct part in hostilities) may be detained by the military in accordance with the laws of war.
B.
The classical model is just that: a classical model. War changes. So too the law of war has not remained static. Rather, it has responded to the ever-evolving nature of combat and the dynamic quality of international relations.
To that end, the recent past has witnessed dramatic changes in the manner in which wars are conducted. War is less a state-based enterprise: the greatest threats to our nation’s security now include those from stateless actors intent on unleashing weapons of mass destruction against civilian populations. Thus, while the principle of discrimination and the category of enemy combatant surely remain a vital part of the law of war, they most definitely must accommodate the new threats to the security of nations. The plurality’s perspective, by contrast, is mired in the models of the past, and completely fails to accommodate the changing nature of warfare.
Changes in military strategy, technology, and international relations are synonymous with war itself. As the following historical examples demonstrate, the law of war has always accommodated new cir *320 cumstances in order to effectuate its core principles and purposes.
An early example of such accommodation is the adaptation of the combatant category to the emergence of “guerilla” fighters. Before the Civil War, guerilla fighters, defined as “[ijrregular armed bodies or persons not forming part of the organized forces of a belligerent ... who engaged in the killing, disabling and robbing of peaceable citizens or soldiers ... from motives mostly of personal profit or revenge,” were relatively unknown. Winthrop, swpra, at 788-84.
Because this type of warrior was new, Union military commanders were unsure whether these guerilla fighters should be treated as “ordinary belligerents and be given the same rights as prisoners of war” or as unlawful belligerents, subject to trial and punishment by the military. Louis Fisher, Military Tribunals & Presidential Power: American Revolution to the War on Terrorism 73 (2005). The leading military scholar of the day, Dr. Francis Lie-ber, opined that the treatment of such guerillas depended on whether they were fighting lawfully or unlawfully and that an absence of uniform should not be considered decisive. Id. at 73-74. If captured during a “fair fight and open warfare,” then guerillas should be treated as prisoners of war. However, if fighting in stealth, such as by disguise or concealment, then guerillas could be punished as unlawful belligerents. Id. This opinion would later appear in Dr. Lieber’s landmark military code, which “heavily influenced” the future Hague and Geneva Conventions. Id. at 71-75.
Likewise, the category of unlawful weapons, though consistent in principle, has “increased in modern times” with the development of new and more devastating weaponry. Winthrop, supra, at 784. Given the frequency of technological changes and advancements in war weaponry, the list of legitimate and illegitimate weapons has necessarily changed “with the progress of inventive science.” Id.; see also Protocol I, art. 36 (requiring Parties to determine whether any “new weapon, means or method of warfare” is permissible). Thus, in just the last century, various types of chemical and biological weapons have been deemed to be unlawful means of warfare, probably because “in disabling or causing death, [they] inflicted a needless, unusual and unreasonable amount of torture or injury.” Winthrop, supra, at 784.
In addition to changes in who participates in wars and how wars are fought, the law of war has also accommodated transformations in international relations. Historically, the law of war only applied when nation-states declared war against each other. However, the United Nations Charter now regulates “armed conflict,” in the form of “ ‘armed attack,’ ‘use of force,’ and ‘threat[s] to the peace.’ ” Bradley & Goldsmith, supra, at 2061 (quoting U.N. Charter art. 2, 42, 51). Given this, “the international law role for declarations of war has largely disappeared” and “armed conflict” is now the “relevant jurisdictional concept” for the law of war. Bradley & Goldsmith, supra, at 2061. The Geneva Conventions of 1949 recognized this change when it stated that the law of war applies not only when there is a declared war but also when there is “any other armed conflict which may arise.” See, e.g., Third Geneva Convention art. 2; see also Bradley & Goldsmith, supra, at 2061.
My purpose is not to applaud or condemn this or that particular in the changing law of war. I list but a few examples of how the law of war has accommodated altered circumstances, but they serve to demonstrate a larger point: in order to effectuate its purposes, the law of war has *321 never remained static. If other principles of the law of war have changed, there should be nothing changeless or immutable about the definition of enemy combatant.
C.
The current struggle against global terrorism bears some of the hallmarks of traditional war: it consists of armed enemies fighting over political and ideological goals. However, other characteristics are clearly new.
First, and most importantly, is the change in who fights war. The law of war was initially designed to regulate encounters between nation-states. However, the greatest threats to our nation’s security now include stateless actors. No longer are our enemies tethered to individual nations; instead, they are diffuse organizations comprised of citizens from many different countries around the globe. Put simply, while terrorism may find support and sponsorship from nation-states, it does not need to be a state-based enterprise.
Congress specifically recognized the emergence of the threat presented by stateless actors when it authorized the President “to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001.” AUMF, 115 Stat. 224 (emphasis added).
Second, the means employed by terrorists “represent! ] [a] breakdown” in the “political code first worked out in the second half of the nineteenth century and roughly analogous to the laws of war worked out at the same time.” Walzer, swpra, at 198. Although terrorist-like acts have always occurred in war, modern terrorism — -that is, “the random murder of innocent people” — “emerged as a strategy of revolutionary struggle only in the period after World War II.” Id. Modern terrorists typically blend into the surrounding community and deliberately strike at soft targets, such as office buildings and other venues in the public square. This makes the “battlefield” in the current conflict essentially unbounded, and renders the traditional indicia used to determine enemy combatant status, such as appearance on a battlefield and the wearing of a uniform, woefully unreflective of the risks posed by terrorist organizations.
Finally, the changes in warfare discussed previously — the presence of stateless terrorists intent on targeting innocent civilians — are magnified by the fact that weapons of mass destruction, whether chemical, biological, or nuclear in nature, are more readily available. See Richard A. Posner, Not a Suicide Pact: The Constitution in a Time of National Emergency 2 (2006) (discussing the potential effects of a terrorist strike with weapons of mass destruction). Put simply, the consequences of not addressing these risks are vastly greater today than they were a generation ago. Today, a single terrorist can kill thousands upon thousands of civilians in an instant. It simply cannot be the case that the law of war must be so bound in obsolescence that it hinders a nation’s ability to recognize new threats.
The plurality surprisingly resists the idea that the law of war has evolved as it applies to these changed circumstances. Ante at 245. This would seem to ignore the fact that the events of 9/11 even happened; all who witnessed or remember them have no doubt that warfare has reached a new and more dangerous phase. Still, the plurality insists that I offer “no legal authority” for the assertion that the law of war has in fact been evolving. Id. But the legal authority is there. In fact, the legal authority is right before the plu *322 rality’s eyes. In the AUMF Congress certainly accepted what the plurality does not: that the traditional principles of the law of war can be adapted to changed circumstances. The text of the AUMF recognizes that traditional concepts such as “battlefield” and “nationality” do not capture the risks presented by terrorists bent on replicating the events of 9/11. The plurality contends, however, that Congress’s view of law of war principles should make not the slightest constitutional difference. See ante 245 n. 24. In not permitting the democratic branches to take into account changes in modern warfare the plurality plainly traps this nation in a time warp. And in denying Congress’s expression under the AUMF any and all constitutional effect, the plurality continues its course of reading the Article I § 8 war power right out of the document. Id.
In passing the AUMF, Congress sought to recognize that the world around us changes; in contrast, the plurality’s view of that world remains quite dangerously static. In fact, while the plurality propounds its view in the guise of interpreting the AUMF, its interpretation — and its commitment to quaint notions of battlefields and nationality — is so textually incorrect, that it is hardly speculative to suppose that the plurality’s interpretation is propounded as a constitutional limitation on the executive as well. Whatever the case may be, it binds the nation to law of war concepts that even the most casual observer of modern terrorist tactics would never accept.
D.
It is undisputed that enemy combatants, if properly classified as such, may be detained by the military. See Hamdi, 542 U.S. at 516-19, 533-35, 124 S.Ct. 2633. Who then may be classified by Congress, acting pursuant to our Constitution, as an enemy combatant? The Supreme Court insists we consult the law of war. Having examined the law of war and considered the recent changes in warfare and international relations, I believe that three criteria best identify who qualifies as an enemy combatant in the current conflict.
I do not suggest that these are the only criteria that might be set forth. Nor would I be so presumptuous as to suggest that these criteria will eliminate the prospect of difficult cases. I do, however, think it is critical to develop some general rules so that cases such as al-Marri’s may be resolved on a principled rather than an ad hoc basis. In fact, until some general guidance is set forth, the executive will have no idea which military detentions are permissible and which are plainly beyond constitutional bounds. And without general guidance, the fear and specter of an open-ended executive detention power of persons lawfully in this country will remain.
Thus, while I do not for a moment contend that any set of criteria will be free from difficulty, I do emphatically contend that these three criteria conform to the evolving principles of the law of war; that they apply the limiting principle on enemy combatant detentions that the government has failed to suggest; and that they should avoid the serious “constitutional concerns” that the plurality and various amici raise, if the AUMF were held, as I believe it must be, to allow the detention of an enemy combatant apprehended on American soil. See ante at 226.
The first two criteria determine who constitutes an “enemy.” Historically, the conception of “enemy” has been nation-based. However, as discussed in the prior section, nations are no longer the only entities that engage in armed conflict. Rather, stateless actors, most prominently *323 terrorist organizations, are now a pressing military threat to the security of America.
Given these realities, an “enemy” is any individual who is (1) a member of (2) an organization or nation against whom Congress has declared war or authorized the use of military force. Taken together, these two criteria closely track traditional law of war concepts that distinguish enemies from non-enemies. At the same time, they recognize that modern military threats include those posed by non-state actors.
I first address the criterion of membership. While the traditional requirement of residency or other affiliation with an enemy nation still applies, the advent of enemy organizations requires a functional equivalent to residency for this new stateless actor. This is achieved by the requirement of membership in the enemy organization. Because membership may be considered more amorphous than residency or citizenship, it is important that there be identifiable facts that indicate such affiliation with the enemy organization. Such indicia of membership may include: self-identification with the organization through verbal or written statements; participation in the group’s hierarchy or command structure; or knowingly taking overt steps to aid or participate in the organization’s activities. See, e.g., Bradley & Goldsmith, supra, at 2114-15.[8] Thus, for example, someone who sends money to “a nonprofit charity that feeds Afghan orphans” that unknowingly makes “its way to al Qaeda” would not be a member of the al Qaeda organization, and it is beyond hyperbole for the plurality to suggest otherwise. Ante at 226. Furthermore, the membership requirement is important because it aids in distinguishing those who are the enemy from those who merely sympathize with the enemy.
The second criterion — congressional authorization — recognizes that Congress may authorize the use of military force against non-state actors, such as terrorist organizations, as it has already with the AUMF. By contemplating such authorization, this second criterion appropriately excludes from the category of “enemy” those persons or groups against whom Congress has not authorized the use of military force. Thus, the notion that any individual affiliated with an organization engaged in purported terrorist activities — such as the “environmental group” mentioned by the plurality — could be considered an enemy combatant is completely unfounded. Ante at 235-36 n. 18. For certain, there are many individuals and organizations engaged in unlawful conduct, and even terrorism. But most of these individuals and organizations have nothing to do with al Qaeda, its affiliates, or the September 11 attacks. Under this criterion, such persons would not be eligible for military detention under the AUMF. This is both consistent with our traditional conception of who should and should not be eligible for detention and appropriate in light of the constitutional imperative that military detention be the exception and not the rule. Indeed, not to require congressional authorization for such detentions in this country splits the ground beneath the war powers right in two.
*324 If the first two criteria address who in modern warfare is the enemy, the third criterion addresses who is the combatant. Historically, this distinction has separated those with military aims from those who do not present a threat to opposing forces. Though yesterday’s soldier has been replaced, at least in part, by those who eschew the conventions of lawful warfare, the purpose underlying this distinction remains unchanged. In light of today’s realities, a “combatant” is a person who knowingly plans or engages in conduct that harms or aims to harm persons or property for the purpose of furthering the military goals of an enemy nation or organization. Like the first two criteria, this requirement closely tracks the relevant traditional law of war rules.
Under this criterion, those who use military-like force against American soldiers or civilians obviously qualify as combatants. Similarly, members of an enemy sleeper terrorist cell that have taken steps, even if preliminary in nature, toward an act of destruction are also considered combatants. Conversely, persons traditionally considered civilians, such as members of the enemy organization who do not possess hostile or military designs, are non-combatants and may not be detained by the military. This includes persons who would clearly be non-combatants, such as a “physician who treated a member of al Qaeda,” because they intend no harm to persons or property. Ante at 226. Such persons would not be subject to military detention.
Two further examples may help illustrate the scope of this framework. First is a person who joins a terrorist organization after Congress has authorized the use of military force against the respective group. In the present conflict, this would include new recruits to al Qaeda or its affiliates after 9/11. Under the above criteria, such persons are clearly part of the “enemy,” even if they were not members of the targeted organization at the time Congress initially acted. This is because it was the organization and its affiliates, and not just the then-members of such groups, against whom Congress authorized the use of force. See AUMF, 115 Stat. 224 (authorizing the use of “all necessary and appropriate force against those ... organizations [that] ... committed” the 9/11 attacks, “in order to prevent any future acts of international terrorism”). Thus, in the current conflict, any “individual can become part of a covered ‘organization’ by joining it after the September 11 attacks.” Bradley & Goldsmith, supra, at 2110. As a result, such a person, if also a combatant, would be eligible for military detention.
Second is a person who commits, or plans to commit, a terrorist act but is not otherwise affiliated with an organization or country covered by a congressional proclamation. Timothy McVeigh is one example that comes to mind. Because such a person is not a member of an enemy organization, he may not be detained as an enemy combatant under the above criteria. Indeed, Congress has never declared war against a single individual or even a discrete conspiracy (unless the Barbary pirates qualify), and it is difficult to envision a scenario in which it would. This is unsurprising, in part because prosecutions of individual terrorists do not ordinarily present the same sort of logistical, informational, and evidentiary problems as large scale terrorist networks or nations. See supra Section II.
However, this in no way suggests that the executive is prohibited from acting preventively in such instances. Rather, it simply means that the threat posed by such an individual must be addressed pursuant to more traditional statutory procedures, such as a material witness warrant, see 18 U.S.C. § 3144, or indictment under *325 any number of potentially relevant criminal statutes, see, e.g., 18 U.S.C. § 2332a (prohibiting the threatened, attempted, or actual use of a weapon of mass destruction); 18 U.S.C. § 2332b (prohibiting acts of terrorism transcending national boundaries); 18 U.S.C. § 2332f (prohibiting the bombing of places of public use or government facilities); 18 U.S.C. § 1751 (prohibiting assassinating or conspiring to assassinate the President or Vice President of the United States); 49 U.S.C. § 46502(a)(2) (prohibiting committing or conspiring to commit aircraft piracy); 18 U.S.C. § 844(f) (prohibiting the damage or destruction of any personal or real property of the United States). In short, such a person can surely be detained and neutralized, but not through the means of military detention.
In sum, the following three criteria must be met in order for someone to be classified as an enemy combatant: the person must (1) be a member of (2) an organization or nation against whom Congress has declared war or authorized the use of military force, and (3) knowingly plans or engages in conduct that harms or aims to harm persons or property for the purpose of furthering the military goals of the enemy nation or organization.
These three criteria reach beyond those of the plurality because they may constitutionally include, if Congress so authorizes, persons arrested outside any formal battlefield, persons not in uniform, and persons arrested on American soil. The criteria are at the same time limited, however, and should not be construed as granting the executive a blank check to brand certain domestic groups as subversive and militarily detain whomever it pleases. Indeed, under these criteria, there are at least three significant limitations on the executive’s ability to militarily detain persons lawfully residing in the United States.
First, there is the significant political check of congressional authorization. Specifically, absent some limited inherent authority needed during times of emergency, the executive may only detain those persons against whom Congress has authorized the use of force. If history is any indicator, Congress does not take such a decision lightly. Indeed, it was the dire events of September 11th that gave rise to the use of military force in the present instance, and it is likely that only emergencies of similar magnitude will trigger a similar response.
Second, even if Congress were to authorize the use of military force against a particular group, it would not be authorizing the executive to make a sweep on the basis of mere membership. This is because membership, without more, is not enough to qualify as an enemy combatant under my proposed criteria. Rather, the person in question must have taken steps to further the military goals of the organization. Thus, McCarthy-like accusations of mere group membership would not suffice as a basis for detention.
Third, persons subject to military detention are afforded the opportunity to challenge the accuracy of their detention before a neutral decisionmaker in accordance with the framework articulated in Hamdi This ensures that the government possesses sufficient evidence to justify a measure as serious as military detention.
Given these checks on executive power, any fear of massive roundups or reckless disregard for human liberty would be misplaced.
Furthermore, these criteria accommodate recent changes in a manner that is consistent with the law of war’s principles and purposes. For instance, one of the purposes of the enemy combatant category is to limit the number of people subject to military force, including military detention, *326 to those who threaten military harm. Each of the above criteria serve that purpose, as they exclude persons who are not members of enemy organizations as well as persons in such groups who do not try to do harm. Another purpose of the category is to determine which persons may be properly detained in order to eliminate the threat they pose. The above criteria are also consistent with that purpose, as they allow the military to detain, without fear of having to release because of an inability to prosecute, those who present real and serious threats to our security and safety.
E.
In addition to comporting with traditional law of war principles and purposes, these three criteria are also in line with all Supreme Court and circuit precedent on the matter. See Ex parte Quirin, 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3 (1942); Hamdi v. Rumsfeld, 542 U.S. 507, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (plurality op.); Padilla v. Hanfl, 423 F.3d 386 (4th Cir.2005). Although each of those cases declined to delineate the full scope of the category, see Quirin, 317 U.S. at 45-46, 63 S.Ct. 2; Hamdi, 542 U.S. at 516, 124 S.Ct. 2633; Padilla, 423 F.3d at 391-92, the criteria articulated here are plainly consistent with their pronouncements about who, at a minimum, qualifies as an enemy combatant. See Quirin, 317 U.S. at 37-38, 63 S.Ct. 2 (finding that people who “associate themselves with the military arm of the enemy government, and with its aid, guidance and direction enter this country bent on hostile acts” qualified as enemy combatants); Hamdi, 542 U.S. at 516, 124 S.Ct. 2633 (finding that someone who was “part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict against the United States there” qualified as an enemy combatant) (internal quotations omitted); Padilla, 423 F.3d at 389 (finding that someone “who is closely associated with al Qaeda, an entity with which the United States is at war; who took up arms on behalf of that enemy and against our country in a foreign combat zone of that war; and who thereafter traveled to the United States for the avowed purpose of further prosecuting that war on American soil, against American citizens and targets” qualified as an enemy combatant) (emphasis omitted).
Moreover, these criteria clearly do not run afoul of three potential constitutional concerns. First is the scope of the executive’s power under Article II. It is widely accepted that the President has some inherent constitutional powers, particularly to act in times of emergency when large numbers of American lives may be at stake. See The Federalist No. 70, at 392 (Alexander Hamilton) (Clinton Rossiter ed., 1999) (noting that the executive branch possesses many qualities, such as “[d]ecision, activity, secrecy, and dispatch,” that are essential to the prosecution of a war); The Federalist No. 74, at 415 (Hamilton) (“Of all the cares or concerns of government, the direction of war most peculiarly demands those qualities which distinguish the exercise of power by a single hand.”). Though the scope of those powers is much debated, we need not address the specific contours of the powers here. This is because the Court in Hamdi — a ease much like this one where no immediate exigency was present — implicitly found no Article II problem when defining the scope of the enemy combatant category, as I do here, in accordance with the law of war. See Hamdi, 542 U.S. at 518-521, 124 S.Ct. 2633. In addition, no other relevant authority indicates that these criteria would impinge on the President’s inherent operational authority as commander-in-chief or his ability to act in times of true emergency.
*327 Second is the Court’s decision in Hamdi, which required under the due process clause that American citizens detained as enemy combatants “be given a meaningful opportunity to contest the factual basis for that detention before a neutral decision-maker.” Hamdi, 542 U.S. at 509, 124 S.Ct. 2633. Whereas Hamdi established the procedures to which at least one type of enemy combatant was entitled, the criteria discussed above address the antecedent question of who qualifies as an enemy combatant. Put another way, this approach articulates a substantive legal definition of enemy combatant, whereas Ham-di enables one class of alleged combatants to procedurally challenge the factual basis of their detention. In short, Hamdi does not present any constitutional problem to the category of enemy combatant as defined by these criteria.
Finally, these criteria do not contravene the principles established in Ex parte Milligan, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866). In that case, the Court established the bright-line rule that civilians may not be tried by military authorities if the civilian courts are open and functioning. Id. at 121. However, as the Court made clear in Quirin, this principle only applies to persons who are not enemy combatants. See Quirin, 317 U.S. at 45, 63 S.Ct. 2 (emphasizing that Milligan “was a non-belligerent” and thus “not subject to the law of war”). Put simply, the Court in Milligan was not addressing the definition of enemy combatant but rather the circumstances under which martial law (which permits the military trial of civilians) may be declared. Thus, the principles laid down in Milligan apply only after it has been determined that the individual in question is a civilian, not a combatant. The framework delineated above addresses the earlier question of who qualifies as a combatant and thus any reliance on Milligan would be misplaced.
Thus, the plurality’s suggestion that the detention of al-Marri would “so alter the constitutional foundations of our Republic” as to “render [them] lifeless” is patently incorrect. Ante at 63. For the reasons discussed, al-Marri’s detention perfectly accords with the Constitution. In fact, it is difficult to square the plurality’s expressed concern over the constitutionality of al-Marri’s detention with its express questioning of our effort to establish constitutional limits that bind “both the executive and legislative branches.” Ante at 49. It is further curious that the plurality should take exception to an inquiry that Boumediene instructs us to undertake. See Boumediene, 128 S.Ct. at 2271 (stating that the executive’s authority depends not only on what the AUMF authorizes, but also on what “the Constitution permits”). Regardless, to the extent that the plurality’s erroneous interpretation of the AUMF in this case was influenced by constitutional concerns, these concerns were unfounded.
F.
The description of the general framework makes possible a straightforward resolution of the specific question of whether the executive has the authority to detain al-Marri as an enemy combatant. The framework also permits the decision to be made in a principled, rather than ad hoc, fashion, and consistent with the constitutional limitations on who may be militarily detained.
As discussed earlier, the Supreme Court held that the AUMF grants the President the authority to detain enemy combatants. See Hamdi 542 U.S. at 518, 124 S.Ct. 2633. Since Congress did not articulate a specific definition of “enemy combatant” in the AUMF, I have looked to the law of war for guidance in determining the scope *328 of the President’s detention authority under the statute. Id. at 518-21, 124 S.Ct. 2633.[9]
Based on the criteria identified and the facts alleged, al-Marri easily qualifies as an enemy combatant. To begin, he satisfies the two criteria used to define an “enemy.” The AUMF authorizes the use of force against al Qaeda, and al-Marri has clearly taken the steps necessary to be considered a member of the organization. Not only did he attend an al Qaeda terrorist camp in Afghanistan, but he also subsequently cultivated relationships with the most senior members of the al Qaeda organization: he met personally with Osama bin Laden and volunteered to martyr himself for the al Qaeda cause; he entered the United States as a sleeper agent under the direction of Khalid Shaykh Muhammed, the mastermind of the 9/11 attacks; and he received substantial funding for his mission from Mustafa Ahmed al-Hawsawi, the financial facilitator of the 9/11 attacks.
Furthermore, al-Marri’s behavior was that of a “combatant.” He did not arrive here with peaceful purposes in mind. At the time he was detained, al-Marri was in the process of preparing cyanide attacks against American civilians and technological attacks on the U.S. financial system. Therefore, it is clear that he knowingly planned to engage in conduct that aimed to harm both life and property. In addition, the direction he received from the hierarchy of al Qaeda indicates that his terrorist actions were undertaken to further the military goals of that enemy organization.
Although al-Marri fits easily within the definition of enemy combatant and may therefore be militarily detained, there will undoubtedly be harder questions concerning the scope of the President’s detention authority in the future. Novel legal problems concerning the proper balance between liberty and security will continue to arise as the struggle against terrorism proceeds. While I respect those who feel differently, I believe the constitutional authority of the executive to detain al-Marri *329 pursuant to clear congressional directive is evident. It matters not that al-Marri was not in uniform, that he was not on some foreign battlefield, or that he was not in the service of a nation’s armed forces. It matters not that his status was that of a lawful alien, that he was arrested on American soil where the threat of belligerency may be greatest, or that he was detained militarily rather than prosecuted by civil authority. To hold that these things mandate a grant of the writ requires this country to face contemporary threats of grave dimension shackled by outmoded notions of the law of war. To rule for al-Marri is to set judicial authority in matters of armed conflict above the combined will and expression of both Congress and the executive. To hold in petitioner’s favor would hobble the political branches in performing the most basic function that the Framers allocated to them — that of providing for the safety and protecting the lives of those they represent, the people of America.
IV. AL-MARRI RECEIVED THE PROCESS HE WAS DUE.
The concurring opinion in this case (the opinion authored by Judge Trader) finds that al-Marri may be detained as an enemy combatant under the AUMF. As expressed earlier in this opinion, I share fully my good colleague’s views on this matter.
My agreement ends there, however. The concurrence asserts that “the process afforded al-Marri” to challenge his detention “did not meet the minimal requirements of due process guaranteed by the Fifth Amendment.” Ante at 253-54. I think this view is in error, and its consequences are serious.
The district court offered al-Marri each of the procedures required by the Supreme Court’s Hamdi decision, but al-Marri believed he was entitled to something akin to a full criminal trial and refused to avail himself of any of these protections. As a result, it is quite wrong to suggest that al-Marri did not receive the full benefits of due process as articulated by what all concede is the most relevant Supreme Court decision. In addition, al-Marri also received protections that satisfied any requirements that the Supreme Court’s recent decision in Boumediene could reasonably be read to impose.
Al-Marri asserts that due process requires additional procedures be afforded him because he was not a “person initially detained ... on a battlefield in Afghanistan.” Ante at 267-69. But these additional procedural safeguards are not required by Hamdi, and there is no necessary connection between the lack of a foreign battlefield presence and the need for enhanced procedural protections. In fact, as discussed earlier in this opinion, a sleeper agent hiding in the United States may present a more serious security threat and raise more pronounced eviden-tiary problems than an enemy soldier located on a battlefield.
Moreover, nothing could be more contrary to the Supreme Court’s due process jurisprudence than the ab initio imposition of inflexible procedural requirements based on artificial and categorical distinctions. Procedures should be ordained not at the outset but as necessary to ensure accurate determinations. To impose such requirements ab initio disregards the “prudent and incremental” approach required by Hamdi and neglects the fact that accuracy must be the touchstone of any procedural due process inquiry. Hamdi, 542 U.S. at 539, 124 S.Ct. 2633; see also Boumediene, 128 S.Ct. at 2268.
The approach of my concurring colleague will thus have significant conse- *330 quenees. By forsaking Hamdi and categorically insisting on more rigorous procedural safeguards at the outset of al-Marri’s habeas hearing, the concurrence would accomplish through constitutional means much of what the plurality would accomplish through statutory interpretation, namely a future disablement of legitimate legislative efforts to authorize Hamdi-style proceedings for even the most dangerous terrorist suspects within this country.
A.
A brief review of the proceeding below will illustrate the soundness of the district court’s approach. In July 2004, counsel filed a petition for a writ of habeas corpus on al-Marri’s behalf in the District of South Carolina. The petition claimed that al-Marri could not be detained as an enemy combatant, and that the government had to either criminally charge or release him. In the alternative, al-Marri sought a hearing at which he would be able to challenge, with the assistance of counsel, the factual basis for his detention. It should be noted that al-Marri has had the assistance of counsel in every proceeding since the filing of this habeas petition.
One year later, after further pleadings from each party, the district court determined that, based on the facts alleged, al-Marri could be detained as an enemy combatant. See Al-Marri v. Hanft, 378 F.Supp.2d 673, 680 (D.S.C.2005). The district court further recognized that, under the Supreme Court’s Hamdi decision, al-Marri had the right to challenge the factual basis of his detention at a hearing that satisfied the constitutional requirements of procedural due process. See id. at 681-82. The district court referred the ease to a magistrate judge to determine what process was constitutionally due al-Marri under Hamdi. See id. at 682.
In proceedings before the magistrate judge, al-Marri sought procedural protections similar to those afforded civilian criminal defendants, such as extensive discovery rights and an opportunity to cross-examine the government’s sources, including high-level Department of Defense officials. See ante at 265-66 & n. 8. The magistrate judge refused to provide al-Marri with these extensive protections, however, and instead adopted incremental procedures consistent with the burden-shifting approach outlined in Hamdi. See Al-Marri v. Wright, 443 F.Supp.2d 774, 778-80 (D.S.C.2006). First, it required the government to provide notice of the factual basis for al-Marri’s detention. Next, if the government was able to produce credible evidence that al-Marri was indeed an enemy combatant, the burden would shift to al-Marri to rebut the government’s evidence. Finally, the magistrate judge noted that, if al-Marri met his burden by presenting “more persuasive evidence,” the government would either have to release al-Marri or participate in a “full-blown adversary hearing,” which would include “greater procedural and evidentiary safeguards” than the first stage of the burden-shifting process. J.A. 191.
Pursuant to these procedures, the magistrate judge found that the Rapp Declaration — which, as described earlier, presented the government’s evidence supporting al-Marri’s detention, see supra at 135— satisfied the government’s initial burdens of providing al-Marri with notice of the factual basis for his detention and producing credible evidence that al-Marri was indeed an enemy combatant. The magistrate judge then gave al-Marri sixty days to present rebuttal evidence.
During this sixty day period, al-Marri protested that his ability to respond to the Rapp Declaration was impeded by the fact that large portions of the Declaration were *331 classified and, therefore, unavailable to him. The magistrate judge agreed with al-Marri and advised the parties that, in determining whether an adversary hearing was necessary, he would only consider evidence disclosed to al-Marri. In response to this ruling, the government filed an updated version of the Rapp Declaration, with many portions declassified.
Al-Marri subsequently filed a response to the updated Rapp Declaration. In his response, al-Marri generally denied the government’s claims, but “decline[d] ... to assume the burden of proving his own innocence.” Al-Marri, 443 F.Supp.2d at 784. Claiming that the procedures developed by the magistrate judge were “unconstitutional, unlawful, and un-American,” al-Marri refused to offer any sort of rebuttal to the government’s evidence. Id.
Because al-Marri failed to offer “any evidence on his behalf,” the magistrate judge recommended the dismissal of al-Marri’s petition. Id. at 785 (emphasis in original). The district court subsequently conducted a de novo review of the proceedings before the magistrate judge, and over al-Marri’s objections, adopted the magistrate judge’s recommendations in full. See id. Because al-Marri failed “beyond question” to rebut his “classification and detention ... as an enemy combatant,” the district court dismissed al-Mar-ri’s habeas petition. Id.
B.
The district and magistrate judges handled this case admirably. I can find no fault with their conclusion that the habeas proceedings provided al-Marri satisfied Hamdi’s due process requirements.
As Hamdi made clear, a detainee held in the United States has the right to challenge his classification as an enemy combatant.[10] Though not entitled to a full criminal trial, enemy combatants are entitled to the “core” protections that constitute the “minimum requirements of due process.” Hamdi, 542 U.S. at 535, 538, 124 S.Ct. 2633. These core procedural rights are threefold: first, a detainee “must receive notice of the factual basis for his classification”; second, a detainee must have “a fair opportunity to rebut the Government’s factual assertions”; and, third, the hearing must occur “before a neutral decisionmaker.” Id. at 533, 124 S.Ct. 2633. The Hamdi opinion repeatedly makes clear that it is these three “essential constitutional promises [that] may not be eroded.” Id.
Even a brief examination of al-Marri’s proceedings demonstrate that he received the benefit of each of these “essential promises.” To begin, the district court was unquestionably a “neutral decision-maker.” Similarly, al-Marri certainly received sufficient “notice of the factual basis for his classification.” In fact, the magistrate explicitly stated that he would only consider information made available to al-Marri when determining whether al-Marri was indeed an enemy combatant.
To this end, the government put forth the Rapp Declaration, which contained extensive evidence of al-Marri’s affiliation with al Qaeda and his destructive designs. For instance, it alleged that al-Marri attended an al Qaeda terrorist training camp *332 in Afghanistan for fifteen to nineteen months; that he subsequently cultivated personal relationships with the most senior members of the al Qaeda hierarchy, including Osama bin Laden, Khalid Shaykh Mu-hammed, and Mustafa Ahmed al-Hawsawi; that he wanted to martyr himself for the al Qaeda cause; and that he was planning to commit chemical and technological attacks in the United States. See supra at 135. This detailed information certainly provided al-Marri with sufficient notice of the factual basis for his detention.
Likewise, al-Marri was provided a “fair opportunity to rebut the Government’s factual assertions.” The magistrate judge gave al-Marri sixty days to respond to the Rapp Declaration, and stated that a “full-blown adversary hearing” would follow if al-Marri was able to adequately rebut the government’s evidence. Since the government relied almost exclusively on evidence directly imputable to him, al-Marri had personal knowledge of the government’s factual basis, and, therefore, ample ability to offer a meaningful response. Put simply, the procedures developed by the magistrate judge provided al-Marri a “fair” and “meaningful” opportunity to be heard in his own defense, and thus were more than sufficient under Hamdi Hamdi 542 U.S. at 533,124 S.Ct. 2633.
The Supreme Court’s recent decision in Boumediene does not change this analysis. To begin, the Court in Boumediene explicitly distinguished the question of what procedures are required under the Suspension Clause from the question of what procedures are required under the Due Process Clause. See Boumediene, 128 S.Ct. at 2270-71. In doing so, the Court explicitly stated that it made “no judgment” as to the issue addressed in Hamdi and presented by al-Marri’s case: what process is constitutionally due to a detainee when “[t]he § 2241 habeas corpus process remained in place.” See Boumediene, 128 S.Ct. at 2270, 2271.
Thus, Hamdi is still the controlling opinion for our inquiry, and it is therefore our duty to apply it. Moreover, even if Boum-ediene were applicable to the matter before us, the process employed by the district and magistrate judges would still be constitutional. Al-Marri received each of the protections required by Boumediene: (1) he was given a “meaningful opportunity” to challenge the legal basis for his detention, (2) his petition was considered by a court that had the remedial power to order his release, and (3) he was granted the “ability to rebut the factual basis for the Government’s assertion that he is an enemy combatant.” Boumediene, 128 S.Ct. at 2267-68. Al-Marri benefitted from the assistance of counsel and was aware of the allegations against him from the very outset of his proceedings, and Boumediene recognized these protections as necessary to the extent they aid in challenging the factual accuracy of a detention, something al-Marri did not do in this case. Id. at 2269-70.
In fact, there is every indication that al-Marri would have received the procedures that Boumediene could reasonably be read to impose if he had sought to contest the government’s allegations in some way. It is true that Boumediene recognizes that both the ability to confront witnesses and some limit on the government’s use of hearsay evidence may be necessary to ensure that a detainee has the capacity “to rebut the factual basis” for his detention. Id. at 2269-70. But the Court in Boume-diene never indicated that it was establishing procedures to be followed inflexibly in every case. See id. at 2271, 2272, 2273 (noting that the “extent of the showing required of the Government in these cases is a matter to be determined”). Instead, the Court emphasized that habeas corpus *333 procedures must be “adaptable” so that they can assure the petitioner a “meaningful opportunity” to contest the legal and factual bases for his detention. Id. at 2267-68. If al-Marri had cast any doubt on the accuracy of his detention, there was every indication that the magistrate and district judges would have done what was needed to confirm or to dispel that doubt, including the provision of those procedures that Boumediene could reasonably be read to require. But severing the need for procedural protections from the need to reach accurate determinations loses sight of the whole purpose of due process.
Thus, the problem here was not, as the concurrence alleges, a failure on the part of the lower court to provide al-Marri with constitutionally adequate procedures, but rather the unwillingness of al-Marri to participate in the process set forth under Hamdi in any meaningful way. Neither the magistrate nor the district judge gave al-Marri short shrift, and both were open to any evidence al-Marri had to offer. Instead, al-Marri offered nothing. In fact, if a general denial were deemed sufficient to bring the accuracy of the Declaration into question, then the whole Hamdi burden-shifting framework would be rendered useless. I thus find it remarkable that al-Marri now complains about procedures he did not even attempt to utilize. Indeed, a civilian criminal defendant cannot refuse to avail himself of the protections offered him at trial and then claim a procedural due process violation; there should be no reason to treat al-Marri any differently. As the district court correctly recognized, “[njeither due process nor the rule of law in general grant a party the right to participate only in the court procedures he deems best or to present his proof whenever it suits him.” Al-Marri, 443 F.Supp.2d at 785.
c.
Although al-Marri received the full benefit of Hamdi’s protections, the concurrence argues that because al-Marri is not “a battlefield detainee,” he is entitled to more rigorous procedural safeguards than those afforded him by the district court. See ante at 267-70. In particular, the concurrence contends that al-Marri has the right to “requir[e] the government to demonstrate through ‘the most reliable available evidence’ that he is an enemy combatant.” Ante at 272. Since the district court did not afford al-Marri this right, the concurrence insists that the proceedings below were unconstitutional.
I cannot agree for two reasons. First, the battlefield/non-battlefield distinction is not to be found in Hamdi and is unreflec-tive of the realities of the current conflict. Second, the imposition of a “most reliable available evidence” requirement rests on a misreading of Hamdi and contradicts the basic tenets of procedural due process.
1.
I begin with the lynchpin of the concurrence’s opinion: the notion that al-Marri is entitled to more rigorous procedural protections than those guaranteed by Hamdi, because al-Marri was apprehended in the United States, rather than on a foreign battlefield, and thus subject to a higher risk of being erroneously detained. Ante at 267-70 & n. 13. This categorical imposition of different procedural requirements based on a neat division between battlefield and homeland is unsound for several reasons.
To begin, the battlefield/non-battlefield distinction is nowhere to be found in Ham-di, the case on which the concurrence relies. See ante at 267-70. Hamdi’s discussion of the constitutional requirements for “enemy combatant proceedings” contains no limitation or qualification based on lo *334 cus of capture. Hamdi, 542 U.S. at 533, 124 S.Ct. 2633; see also id. at 524, 124 S.Ct. 2633 (framing the issue as “what process is constitutionally due a citizen who disputes his enemy-combatant status”); id. at 532, 124 S.Ct. 2633 (applying the Mathews framework to identify a process that “strikes the proper constitutional balance when a United States citizen is detained in the United States as an enemy combatant”). Indeed, Hamdi makes plain that the procedures required in “the enemy-combatant setting” apply equally to all enemy combatants, not just those captured on a foreign battlefield. Id. at 535, 124 S.Ct. 2633.
Furthermore, although the concurrence claims that the “risk of erroneously detaining a civilian” is “much greater inside the United States than” on “a conventional battlefield within the borders of a foreign country,” this is often not the case. Ante at 270. Indeed, the modern battlefield is often cluttered with shifting alliances and the lack of distinguishing uniforms. One only need to think of the villages in Vietnam or the hills of Afghanistan to recognize that discerning friend from foe can be very elusive on a foreign battlefield.
Hamdi’s refusal to categorically distinguish detainees based on their locus of capture reflects the true nature of the current conflict. As Congress recognized in the AUMF and as the nature of the 9/11 attacks made pellucidly clear, the struggle against al-Qaeda is not bound to foreign lands or distant shores. See supra at 320-22. The need for legislatively sanctioned procedures in accordance with the laws of war does not dissipate simply because an enemy combatant is apprehended domestically rather than on a foreign battlefield. See supra at 306-11. In fact, the concerns underlying the need for more limited procedures in enemy combatant hearings, such as the presence of highly sensitive information and the risk of such information being transmitted to terrorist networks, confederates, and affiliates, is equally, if not more, pronounced when dealing with a sleeper al Qaeda agent operating within our borders.
Despite its contention to the contrary, see ante at 270 n. 14, the concurrence thus commits the same error as the plurality: it categorically rests its decision on an artificial distinction between battlefield and non-battlefield capture. Indeed, it offers no other meaningful rationale for distinguishing between the procedures approved of in Hamdi and the procedures afforded al-Marri. See, e.g., ante at 267, 267-70 & n. 13, 269-70. The Supreme Court has refused to resolve issues concerning the process due enemy combatants based on the faux simplicity of inflexible categories, and we should not deny the realities of contemporary conflict by contravening its directive.
2.
In addition to its distinction between battlefield and non-battlefield detainees, the concurrence develops another procedural innovation: the “most reliable available evidence” requirement. The requirement posits that al-Marri has the right to require the government to produce “ ‘the most reliable available evidence’ that he is an enemy combatant.” Ante at 271. This requirement is just as problematic as the attempt to dictate the appropriate level of procedure based on the locus of capture.
In deriving this standard, the concurrence relies on the following observation made in Hamdi: “[Ejnemy combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict. Hearsay, for example, may need to be accepted as the most reliable available evidence from the Government in such a pro *335 ceeding.” Hamdi, 542 U.S. at 533-34, 124 S.Ct. 2633; see ante at 264-65, 269 (quoting Hamdi). Rather than take this comment for what it clearly is — an example of how the procedures afforded enemy combatants need to account for the evidentiary burdens that are frequently present in such cases — the concurrence develops a hardline requirement that the government must always show, in its initial presentation, that the evidence offered is the most reliable evidence available.
Imposing a “most reliable available evidence” standard at the very outset would be a fundamental misapplication of Hamdi. To begin, this approach abandons the careful incrementalism and the actual “burden-shifting scheme” set forth by the Supreme Court in that decision. Hamdi, 542 U.S. at 534, 124 S.Ct. 2633. As discussed earlier, Hamdi only requires the government to initially “put[] forth credible evidence that the habeas petitioner meets the enemy-combatant criteria.” Id. The government need not put on further evidence unless the detainee responds with at least some evidence that “he falls outside the criteria.” Id. By forsaking the framework envisioned by Hamdi, the concurrence relieves al-Marri of any obligation to contest the factual basis of his detention.
The concurrence, however, indicates that the Rapp Declaration may be insufficient under Hamdi. This is simply not the case. Indeed, Hamdi expressly recognized that the government’s initial burden may be satisfied by “a knowledgeable affi-ant” who “summarize[s]” the evidence on which the detention was based. Hamdi, 542 U.S. at 534, 124 S.Ct. 2633. Likewise, Hamdi explicitly held that in an enemy combatant proceeding, “a habeas court ... may accept affidavit evidence like that contained in the Mobbs Declaration, so long as it also permits the alleged combatant to present his own factual case to rebut the Government’s” evidence. Id. at 538, 124 S.Ct. 2633 (emphasis added). Because the Rapp Declaration is far more extensive and detailed than the Mobbs Declaration, the former satisfies the government’s initial burden and serves the basic purpose of affording notice to al-Marri of why he is detained.
Moreover, beyond being a misapplication of Hamdi, this “most reliable available evidence” approach is also plainly contrary to the fundamental tenets of procedural due process. As the Supreme Court has repeatedly held, the touchstone of any due process inquiry must be accuracy. Indeed, the imposition of additional procedural protections has traditionally been linked to the ability of those safeguards to prevent erroneous deprivations of protected interests. See Mathews v. Eldridge, 424 U.S. 319, 343, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); Boumediene, 128 S.Ct. at 2268-69; Hamdi, 542 U.S. at 529, 534, 124 S.Ct. 2633; see also Teague v. Lane, 489 U.S. 288, 313, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (noting that due process requires the retroactive application of “procedures without which the likelihood of an accurate conviction is seriously diminished”); Laurence H. Tribe, American Constitutional Law, § 10-13, at 714 (2d ed.1988) (noting that the “value [of] procedural safeguards” is primarily determined by their potential to minimize “factual error in the application of the relevant substantive rules”).
In order to allow for adjustments that help ensure accuracy, the Supreme Court has consistently emphasized the need for flexible procedures that would permit district courts to employ protections pursuant to the “demands” presented by a “particular” case. See Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); see also Boumediene, 128 S.Ct. at 2268 (noting that habeas is an “adaptable remedy,” requiring more protections in *336 situations of greater factual uncertainty); Mathews, 424 U.S. at 334-35, 96 S.Ct. 893; Tribe, supra, § 10-14, at 718 (noting that the Court’s “flexible approach” to procedural due process allows courts to apply protections on a “case to case” basis). In fact, the Court has made plain that due process never requires any “fixed” set of procedures that cannot be adapted to the circumstances of the case at hand. Mathews, 424 U.S. at 334, 96 S.Ct. 893 (quoting Cafeteria & Restaurant Workers Union, Local 173, AFL-CIO v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)). Furthermore, as the Court explained in Hamdi, the procedures for reviewing enemy combatant detentions should be “both prudent and incremental,” with adjustments made only as the need for additional protections became apparent in a given case. Hamdi, 542 U.S. at 539, 124 S.Ct. 2633 (emphasis added).
By imposing a “most reliable available evidence” requirement on the government at the very outset of a Hamdi hearing, the concurrence has adopted an approach that neglects these foundational principles of procedural due process. Indeed, by categorically applying its additional requirement even though al-Marri has never cast the slightest bit of doubt on the accuracy of his enemy combatant status, the concurrence fails to recognize that due process is first and foremost about accuracy. And by forcing the government to produce the “most reliable available evidence” at the outset of all cases involving non-battlefield detainees, the concurrence diminishes the ability of district courts to prudently and incrementally apply procedures based on the particular circumstances and need for accuracy in the case at hand.
This approach threatens large consequences. As the concurrence recognizes, the breadth of al-Marri’s procedural demands are staggering. Ante at 265-66 & n. 8. Not only does al-Marri request the opportunity to depose various government officials, including “high-level” officers in the Executive Branch, but he also seeks discovery of the following evidence:
all statements made by al-Marri; all documents relied upon by Rapp or describing the sources of information referenced in the Rapp Declaration; all documents upon which the government intended to rely; all documents upon which the CIA, Department of Justice, Department of Defense, and the President relied in determining whether al-Marri was an enemy combatant; all documents describing the standard for the designation; [ ] any exculpatory evidence; ... [and] all documents pertaining to interrogations and interviews conducted by United States officials or others acting on their behalf.

Id.

The “most reliable available evidence” requirement would provide al-Marri with access to this evidence unless the government demonstrated that its production was “impractical, outweighed by national security interests, or otherwise unduly burdensome.” Id. at 273. In other words, under this approach, the default scenario would grant al-Marri extensive discovery rights regardless of whether he could raise even the slightest doubt as to the basis of his detention.
It is difficult to think of a more dangerous way to handle the highly sensitive information that is invariably used to apprehend terrorist sleeper agents such as al-Marri. The fuzzy “most reliable available evidence” standard provides district courts with precious little guidance. Indeed, district courts are given little direction as to what constitutes the “most reliable available evidence” or as to the procedures that should be used to make such a determination. Instead, district *337 courts are merely told to resolve these threshold evidentiary questions to their “satisfaction.” Id. at 273. This lack of clarity provides detainees with nothing less than an invitation to engage in “graymail” and other harassing tactics. See supra at 308-09.
Judge Gregory recognizes that the concurrence’s approach “will leave the district court with more questions than answers.” Ante at 277. He attempts, however, to resolve this uncertainty by suggesting procedures of his own. In particular, he suggests that the district court employ at the outset of proceedings an “in-camera, ex-parte hearing,” modeled after circuit precedent and CIPA, to determine which evidence should be turned over to al-Marri. Id. at 281-83. While I respect my good colleague’s attempt to provide guidance for the district court on remand, I find the procedures he proposes to be equally as problematic as those suggested by the concurrence. To begin, relying on CIPA at the outset risks transporting wholesale a statute specifically passed to address criminal prosecutions into the completely different context of military detention. See, e.g., 18 U.S.C. app. Ill § 8 (stating that the protections of CIPA are designed to “prevent unnecessary disclosure of classified information involved in any criminal proceeding” (emphasis added)). As discussed earlier in Section II, Congress passed the AUMF fully aware of the existence of CIPA, but it nevertheless authorized the President to detain enemy combatants because of the inherent limitations of the criminal justice system in dealing with matters of war. Moreover, under this “in-camera hearing” approach, al-Mar-ri is once again provided with all sorts of procedures before having to cast the slightest doubt on the accuracy of his detention. There is simply no reason to risk, at the very outset of every enemy combatant habeas proceeding and without any benefit in ensuring accurate determinations, the extraordinary costs that may result from the compelled disclosure of sensitive information.
Of course, the sorts of procedures requested by al-Marri and contemplated by the concurrence’s “most reliable available evidence” requirement may eventually come into play in some Hamdi proceedings. So too may CIPA protections. But these procedures should only be used if they are necessary to ensure the accuracy of a detention. Applying additional procedures at the outset is, to understate the matter, ill-advised.
Hamdi recognized that the imposition of additional safeguards in the enemy combatant setting has the “uncommon potential to burden the Executive at a time of ongoing military conflict.” Hamdi 542 U.S. at 533, 124 S.Ct. 2633; Ernest A. Young, The Constitution Outside the Constitution, 117 Yale L.J. 408, 440 (2007). Granting al-Marri the benefit of additional protections, even though he has never used the procedures available to him, and even though no evidence has emerged to suggest that these additional protections are needed, imposes procedural burdens without any indication that these burdens will produce a corresponding reduction in the likelihood of erroneous deprivation. Due process simply does not require such a result.
D.
Process is of inestimable value to law. It is vital in ensuring fair treatment to individuals, in preventing the arbitrary exercise of power by the state, and in holding the vast arsenal of executive authority in check. And yet, as with so much else, there is a balance. Taken to sufficient lengths, process can accomplish the dismemberment of meaningful democratic *338 prerogatives and the frustration of vital substantive ends. Taken too far, process can essentially paralyze public officials in their attempts to promote the public welfare and, in this area, to provide even the most basic assurances of public safety.
The Supreme Court in Hamdi sought to strike the balance between the beneficial use of process, on the one hand, and its detrimental overuse on the other. As noted, Hamdi placed the initial burden in enemy combatant proceedings on the government, required the government to give notice of the factual basis for detention, and provided the detainee with an opportunity to controvert the government’s evidence before a neutral decisionmaker. At the same time, however, Hamdi was keenly conscious of the need not to deprive the executive and legislative branches of the tools to deal with the new danger in our midst. Its seminal requirement is that the detainee place the government’s evidence in some doubt before the refinements of the criminal justice process come into play. By relieving the detainee of that threshold burden, we take at least the first initial steps toward making Hamdi hearings ever more replicative of the criminal justice process — a process whose full and familiar regalia our profession may soon enough adopt.
This would be a mistake. The transgressions that al-Marri is accused of committing are not ordinary crimes, although both the plurality and the concurrence appear to treat them in varying degrees as such. Instead, the destructive acts of 9/11 are more akin to warfare than to crime. That was the view that Congress expressed in passing the AUMF. That was the view the Supreme Court expressed in its Hamdi decision. Whether by declining to apply the AUMF or by casting aside the Hamdi framework, we move toward the criminal justice model, the concurrence accomplishing procedurally much of what the plurality attempts to accomplish substantively — a limitation on the elected branches’ ability to prosecute the ongoing struggle against global terror in accordance with the laws of war. I am reluctant to supplant the wisdom of others on so grave a matter with my own, and I would hold that under the AUMF and in accordance with Hamdi, al-Marri was accorded the process he was due — the process which he never once sought to utilize.
V. THE DETENTION OF AL-MARRI ACCORDS WITH AMERICA’S LEGAL TRADITION.
I wish finally to take a step back. In the aftermath of September 11, judges have experienced their own distinctive tensions. As guardians of the nation’s constitutional tradition, courts have struggled to avoid placing a judicial imprimatur on anything inimical to the nation’s priceless heritage of liberty and timeless respect for human rights. At the same time, we dread seeing again the faces of the stricken and the fallen, and being left to wonder if some grave constitutional miscalculation of our own played even some small part in sealing a fellow countryman’s sad fate. These conflicting concerns — of sacrificing values or jeopardizing lives — are not absent in the debate over the detention in al-Marri’s case.
Writing in the heyday of Jacksonian democracy, Alexis de Tocqueville sketched the elements of American life that he thought set us apart: our devotion to the equality of man, our individualism, our commitment to enterprise, our practice of religion, our profound patriotism, our commitment to a free press, and our devotion to the rule of law. See Alexis de Tocqueville, Democracy in America (J.P. Mayer ed., George Lawrence trans., Perennial Classics 2000). On this last point, it is *339 said, the last years of struggle have done their greatest damage — with “executive unilateralism” lessening our commitment to due process, “mock[ing] the very notion of constitutionalism and [making] light of any aspiration to live by the rule of law.” Neal K. Katyal & Laurence H. Tribe, Waging War, Deciding Guilt: Trying the Military Tribunals, 111 Yale L.J. 1259, 1259-60 (2002). Likewise, it is alleged, a rejection of al-Marri’s petition in this case “would so alter the constitutional foundations of our Republic,” that it “would have disastrous consequences for the Constitution — and the country.” Ante at 252-53. I do not think these indictments fair, and I believe it essential to explain why al-Mar-ri’s detention would leave the beacon of our constitutionalism bright and undimmed.
Any sound perspective on al-Marri’s detention must start with the magnitude of what brought it on. It bears lasting remembrance that what happened on September 11 was an attack upon the symbols of American freedom and democracy. It was a three-thousand person slaughter whose victims, going about their daily lives in an effort to do something meaningful, were innocent of any wrong against those who attacked them. The AUMF expressed this nation’s sorrow and outrage at what happened. To credit its intended scope respects Congress’s intention and those who died that day.
The notion that the military detention of suspected al Qaeda terrorists such as al-Marri somehow threatens to drag us even incrementally towards the degraded level of our adversaries is simply unfathomable. Al-Marri’s detention is one of only two domestic detentions of enemy combatants conducted in the seven years since the 9/11 attacks. This country has no equivalent of jihad, no appetite for suicide bombs in public squares and markets, no thought of destroying places of worship, no intent to cause harm that is greater than necessary to defeat a determined enemy. Military detention, circumscribed carefully by the law of war’s cardinal principle of discrimination, is no disproportionate response to those who aim to murder scores of thousands of civilians; there is no moral equivalence, only contrast, and nothing in our constitutional tradition makes the detention of terrorists with strong al Qaeda ties unlawful simply because they prefer mass killings here rather than on some foreign battlefield. See Quirin, 317 U.S. at 38, 63 S.Ct. 2.
The immense controversy over al-Mar-ri’s detention obscures the historical perspective. I do not mean to whitewash wrongs we have committed in the last seven years — Abu Ghraib stained and sullied all we stand for; the government’s roundup and detention of Muslim immigrants in the immediate aftermath of 9/11 transgressed our commitment to due process and individualized consideration; and Guantanamo Bay has proven controversial, to be sure. We have stumbled on an unknown landscape, and sometimes worse.
But consider, for example, the Red Scare and roundup of social dissidents after World War I, or the internment of Japanese-Americans during World War II, or the surge of MeCarthyism during the Cold War, or the bludgeoning of dissent during the last stages of Vietnam. What makes those moments in our history so very sad was that so much of the country approved of them. A fever took hold, and minorities in our country often bore the brunt of it. But al-Marri’s detention— and the capture of al Qaeda members in our midst — presages no anti-Muslim rage, no attacks on Muslims’ basic rights of free religious exercise and speech, no intent to deny our fellow citizens of Muslim faith inclusion in the American embrace. As *340 the terrorist threat has persisted, there has been no demand for dragnet measures that would sweep in innocent and culpable alike, and there has been no demagogic figure attempting to demonize our friends of Muslim faith at home because they may happen to share a loose national or religious identity with enemies abroad.
Our domestic response to 9/11 has been, to judge by the magnitude of the event and the lessons of history, largely measured. But that alone does not carry the argument. Indeed, the reason for our measured response has not chiefly been executive forbearance, but rather a faithfulness to the path laid down by our Founders, with all three branches of our tripartite form of government playing their constitutionally assigned role in charting our course. See David A. Martin, Judicial Review and the Military Commissions Act: On Striking the Right Balance, 101 Am. J. Int’l L. 344, 347-48 (2007) (noting the “productive” “interbranch colloquy” that took place after 9/11).
The Constitution is not merely an assignation of rights; it is also an allocation of authority. And it is the structural features of our Constitution that allowed a nation bemused in August to yet recover its residue of fiber in September. Article II embodies the great and immediate assertion of national will. It is the constitutional function of the executive to act energetically in time of national peril; no other branch of government is remotely capable of doing so. But executive power can promote liberty through the provision of security, or it can threaten liberty through the disregard of rights. So the balance must be struck. In this regard, Separation of Powers does not mean Hostility of Powers. It is the obligation of each branch to check the excesses of another, but each branch is equally obliged not to forsake its own limitations in thwarting another’s legitimate role.
Rejection of al-Marri’s petition does not signal some pattern of surrender by a coequal Congress and judiciary to a rampaging executive branch. The legislative branch has not forfeited its constitutional function. In the last seven years, Congress has passed at least seven resolutions or statutes delineating the appropriate scope of our nation’s response to the terrorist threat: the Authorization for Use of Military Force in 2001, Pub.L. No. 107-40, 115 Stat. 224; the USA PATRIOT ACT of 2001, Pub.L. No. 107-56, 115 Stat. 272, which was revised and reauthorized in 2006, Pub.L. No. 109-177, 120 Stat. 192; Pub.L. No. 109-178, 120 Stat. 278; the Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub.L. No. 107-243, 116 Stat. 1498; the Homeland Security Act of 2002, Pub.L. No. 107-296, 116 Stat. 2135; the Detainee Treatment Act of 2005, Pub.L. No. 109-148, §§ 1001-06, 119 Stat. 2680, 2739-44; the Military Commissions Act of 2006, Pub.L. No. 109-366, 120 Stat. 2600; and the Protect America Act of 2007, Pub.L. No. 110— 55, 121 Stat. 552, which amended the Foreign Intelligence Surveillance Act of 1978. Those who think these acts ceded too much power to the executive may be right or they may be wrong. But they miss a crucial point: these congressional actions have been fought on “the boisterous ocean of political passions,” see Letter from Thomas Jefferson to Monsieur DuPont de Nemours, March 2, 1809, quoted in The Life and Selected Writings of Thomas Jefferson 545 (Adrienne Koch & William Pe-den eds., 1993), and while the results of any fight are never pleasing to everyone, it is precisely the way our system is supposed to work.
Nor would the rejection of al-Marri’s petition signal an atrophied judicial role. *341 The courts have been more actively involved in our current struggle than in any other war in our history. The amount of litigation surrounding the struggle against terrorism would have been unthinkable in any prior conflict. By my count, well over two dozen cases on the subject have been heard in federal court, including those whose names are now familiar: Hamdi; Rasul; Hamdan; Padilla; Moussaoui; Boumediene. The critics who see these decisions as too supine may be right or they may be wrong. But as al-Marri’s appeal shows, they have had their day and more in court, and that too is how our system is supposed to work.
Al-Marri’s ease — like so many others in this struggle — has been for the judiciary one of deep silences. We may never know whether we have struck the proper balance between liberty and security, because we do not know every action the executive is taking and we do not know every threat global terror networks have in store. So our belief in ourselves and our institutions has to persevere in this unprecedented world of imperfect understanding where the definitions of victory and progress and proportionate response are forever open to debate.
I feel firmly, however, based on the facts presented, that al-Marri’s petition should be dismissed. The executive’s decision to detain him — or any similarly situated member of al Qaeda, lawfully in this country or not — is a proportionate response targeted precisely at those terrorists who slaughtered thousands of civilians on our soil and threaten to do the same to tens of thousands more. His detention is consistent with the law of war, and our constitutional requirements of due process as well. It is a product of executive action that has been legislatively sanctioned and it reflects the core understanding of our constitutional system that at the end of the day, when momentous questions of life and death are at stake, this nation places its deepest bets upon democracy, and the people’s safety must reside and rest with those who have the people’s sanction.
I do not mean to minimize the step of detaining militarily someone of lawful status, seized within this country, and I have tried throughout to suggest the limits that the laws of war, the need for congressional sanction, and the requirement of some meaningful form of access to the courts impose upon this executive practice. See Hamdi 542 U.S. at 524-39, 124 S.Ct. 2633. By reviewing the lawfulness of the detention, we confirm that there is access to the courts and that there are limits on actions impinging liberty that can be taken in the name of national security. By rejecting this petition, we would have the chance to recognize that the democratic branches have taken reasonable and constitutional steps to address unprecedented threats of unforeseeable magnitude against our country.
It is possible to protect American values and American lives. Indeed, this was the promise of our Founding, when a government was “instituted among Men, deriving [its] just powers from the consent of the governed” in order to secure the “unalienable Rights” of both “Liberty” and “Life.” See Declaration of Independence para. 2 (U.S.1776). I disagree with the result reached here, but I do so in the belief that my colleagues have helped in some small way to demonstrate the good and earnest values that animate this country — values that require America prevail.

. Given the nature of the court’s judgment in this case, the matter of how to designate my *294 colleagues' views has proven somewhat difficult. This is largely because the so-called Screws rule, adopted by Judge Motz and those who join her opinion, has traditionally been invoked by a smaller group of judges (usually one or two) joining the judgment of a larger number, rather than vice versa. See Screws v. United States, 325 U.S. 91, 113, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (Rutledge, J., concurring in the result); see also, e.g., Hamdi v. Rumsfeld, 542 U.S. 507, 553, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (Souter, J., with Ginsburg, J., concurring in part, dissenting in part, and concurring in the judgment); US Airways, Inc. v. Barnett, 535 U.S. 391, 408, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002) (O'Connor, J., concurring); Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 607-08, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) (Stevens, J., concurring in part and concurring in the judgment). Despite the "reverse-Screws" wrinkle of this case, I refer to the opinion authored by Judge Motz as the plurality because her opinion enjoys the largest number of judges in support of the ultimate judgment. Likewise, I refer to the opinion authored by Judge Traxler as the concurrence, inasmuch as he has not joined the plurality. For the sake of clarity, I refer to the other opinions filed in this case by the name of the author.

. In his concurrence, Judge Gregory expresses a similar preference for criminal prosecution. He suggests that because the executive chose to criminally prosecute several individuals who might potentially have been detained under the AUMF — e.g., Moussaoui, Padilla, and Abu Ali — it must provide al-Marri with procedures that at least resemble a criminal trial. Ante at 279-81, 281 n. 5. This argument, of course, overlooks the executive's discretion to choose between criminal prosecution and military detention in those instances where Congress has deemed the latter appropriate. The fact that the executive has judiciously chosen to forego using its detention power under the AUMF in some cases where it is available does not deprive it of the power in other instances where it is necessary. The question before the courts in either circumstance is whether the executive action is a lawful one.

. The plurality notes that in Hamdi I made the suggestion that domestic detentions and detentions of enemy combatants on foreign battlefields present different sets of problems. See ante at 232 n. 15. I agree with this, and I have approached the issue in this case with these differences in mind.

. Of course, to say that military detention is available is not to say that it is required. Rather, if military detention is a permissible option, then the specific decision of whether to detain or prosecute should be left to the sound discretion of the executive branch. See Padilla v. Hanft, 423 F.3d 386, 394-95 (4th Cir.2005) (noting "that the availability of criminal process cannot be determinative of the power to detain, if for no other reason than that criminal prosecution may well not achieve the very purpose for which detention is authorized in the first place").

. The plurality asserts that any constitutional limits placed on the executive's ability to abrogate the Bill of Rights amount to what is in effect a limiting construction on the AUMF itself. See ante at 226-29 n. 9. This is quite mistaken: there is a difference between statutory and constitutional interpretation, and the plurality is wrong to conflate the two. Recognizing that there are constitutional limits as to who the executive may militarily detain is thus a far cry from placing a limiting construction on the AUMF. Moreover, the limiting construction that the plurality places upon the plain language of the AUMF — namely that it does not apply to the military detention of any enemy combatant within this country — is a far more dramatic restriction of congressional language and executive authority than the Constitution requires. Quite apart from the different result we reach in al-Marri's case, the plurality’s willingness to intrude upon the exercise of the warmaking powers in the guise of statutory interpretation bears no resemblance to any constitutional structure I have known.

. Non-combatants, also known and referred to by the plurality as civilians, are by definition anyone who is not deemed a combatant. See, e.g., Beard, supra, at 60; Bradley & Goldsmith, supra, at 2107, 2113-14; see also Wal-zer, supra, at 138-59; Winthrop, supra, at 778-79.

. The exact line between direct and indirect participation is not a clear one. See Beard, supra, at 60 (noting that "[d]etermining precisely when noncombatants lose their protected status ... has not always been easy”); Bradley & Goldsmith, supra, at 2115 (noting that “there is uncertainty about where the line should be drawn”). However, there is universal agreement that a civilian who engages in military-like actions, such as discharging a weapon against the enemy, directly participates.

. The plurality chides me for referencing the works of "distinguished legal academics.” Ante at 239 n. 20. I of course make no apologies for drawing upon the work of distinguished scholars when attempting to discern the constitutional framework within which this question of first impression must be located. Indeed, to rule out any reliance upon those who have studied and reflected on these questions seems to me a form of "know-nothingism” in which my distinguished colleagues in the plurality have also wisely declined to indulge.

. In the Military Commissions Act of 2006 ("MCA”), Congress defines "lawful enemy combatant” as a person who is:
(A) a member of the regular forces of a State party engaged in hostilities against the United States;
(B) a member of a militia, volunteer corps, or organized resistance movement belonging to a State party engaged in such hostilities, which are under responsible command, wear a fixed distinctive sign recognizable at a distance, carry their arms openly, and abide by the law of war; or
(C) a member of a regular armed force who professes allegiance to a government engaged in such hostilities, but not recognized by the United States.
Military Commissions Act of 2006, Pub.L. No. 109-366, § 948a(2), 120 Stat. 2600, 2601.
Furthermore, the MCA defines “unlawful enemy combatant” as "a person who has engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents who is not a lawful enemy combatant (including a person who is part of the Taliban, al Qaeda, or associated forces),” or "who, before, on, or after the date of the enactment of the [MCA], has been determined to be an unlawful enemy combatant by a Combatant Status Review Tribunal or another competent tribunal.” Id. § 948a(l).
Though informative in some respects, these efinitions are of limited assistance and relevance in this case. This is because they apply only to the detainees tried by military commissions established by the MCA, namely aliens who are unlawful enemy combatants as defined by the MCA. Id. § 948b-c. Thus, these provisions do not specifically address the scope of the President’s detention power under the AUMF nor the definition of "enemy combatant” for purposes other than the military commissions under the MCA. See Richard H. Fallon, Jr. & Daniel J. Meltzer, Habeas Corpus Jurisdiction, Substantive Rights, and the War on Tenor, 120 Harv. L.Rev. 2029, 2109 (2007).

. Specifically, Hamdi established a framework for adjudicating the habeas petitions of “citizen-detainee[s].” Hamdi, 542 U.S. at 533, 124 S.Ct. 2633. Although both the government and al-Marri address the issue of whether lawful aliens are entitled to the same level of protection as citizens, I need not resolve the issue for the purposes of this case. This is because the procedures provided al-Marri are sufficient under any reading of Hamdi.